WASHTENAW COUNTY ROAD COMMISSIONERS *v.*
PUBLIC SERVICE COMMISSION.

NEW YORK CENTRAL RAILROAD COMPANY *v.* SAME.

1. RAILROADS — INSTALLATION OF GATES AT GRADE CROSSINGS —
   STATUTES.
   Sections of the railroad incorporation act, empowering the rail-
   road commissioner to order railroads to construct and operate
   railroad crossing gates at highway grade crossings where ne-
   cessity therefor was found, have not been repealed by implica-
   tion (CL 1948, §§ 466.2–466.4).

2. STATUTES—PUBLIC SAFETY—REPEAL.
   A statute conferring a power relating importantly to the public
   safety should not be held to have been removed without leg-
   islation which, either in specific terms or by plain implication,
   clearly reveals the legislative intent to repeal.

3. PUBLIC SERVICE COMMISSIONS—GATES AT HIGHWAY GRADE CROSS-
   ING—FINDING OF NECESSITY—RECORD.
   Public service commission's finding of necessity for half-roadway
   gates, in addition to flashing light signals, at particular high-
   way grade crossing of double tracks *held*, amply justified by
   record presented showing poor visibility, a curve in the railroad
   and recent accidents (CL 1948, §§ 466.2–466.4).

4. SAME—GATES AT HIGHWAY GRADE CROSSING—COST OF INSTALLA-
   TION—STATUTES.
   Costs of installing gates at highway grade crossing must be borne

REFERENCES FOR POINTS IN HEADNOTES

[1, 3, 4] 44 Am Jur, Railroads § 520 *et seq.*
[2, 13] 50 Am Jur, Statutes §§ 538, 539.
[5] 43 Am Jur, Public Utilities and Services § 225.
[6] 43 Am Jur, Public Utilities and Services § 193 *et seq.*
[8] 44 Am Jur, Railroads § 34.
[11, 12] 44 Am Jur, Railroads § 397.
[14] 50 Am Jur, Statutes § 543.
[15] 50 Am Jur, Statutes § 542 *et seq.*
[16] 50 Am Jur, Statutes § 534 *et seq.*

entirely by railroad ordered to install them, where pertinent statute makes no grant of power to the public service commission to divide the costs (CL 1948, §§ 466.2–466.4).

5. Same—Findings of Fact—Evidence—Courts.

Courts have no power to substitute their judgment on matters of fact for the judgment of the public service commission, where it is supported by substantial evidence.

6. Same — Statutes — Police Power — Half-Roadway Gates at Highway Grade Crossing of Railroad.

Statute vesting police powers of the State over railroads in the public service commission "to exercise the same in accordance with the requirements of the law" does not alone confer power to order railroads to make installations of half-roadway gates at highway grade crossings, it being necessary for the legislature to set forth specifically the broad policies upon which the commission acts (CL 1948, § 462.44).

7. Same—Statutes—Public Safety—Half-Roadway Gates at Highway Grade Crossing of Railroad.

Statute relating to public safety at highway crossings of railroads at grade wherein the public service commission is empowered to order flasher light signals at such crossings is not construed as empowering the commission to add automatic half-roadway gates which add approximately 100% to the total cost of the installation (CL 1948, § 469.8).

8. Same—Railroad Commissioner's Powers and Duties—Protection of Crossings.

The public service commission has succeeded to the functions and authority previously held by the railroad commissioner with respect to protection of highway crossings (CL 1948, §§ 462.44, 466.2–466.4; CLS 1956, § 460.53).

9. Railroads—Title of Act—Gates at Grade Crossings.

The title of the railroad incorporation act is broad enough to encompass both the duty upon a railroad to install gates at grade crossings and the conferral of power in the public service commission to order same (CL 1948, § 463.1 *et seq.*; §§ 466.2–466.4).

10. Words and Phrases—Railroad Crossing.

The term "railroad crossing" is normal language for the crossing at grade of a highway and a railroad, being required by statute to be posted at every highway crossing in the State (CLS 1956, § 469.5).

11. PUBLIC SERVICE COMMISSIONS—GATES AT HIGHWAY CROSSING OF RAILROAD.

Provision of statutes conferring power on public service commission to require the installation of gates at highway crossing of railroads *held,* to have manifestly meant at the cost of the railroad, since any other interpretation would have meant that the authority was meaningless (CL 1948, §§ 466.2–466.4).

12. SAME—GATES AT HIGHWAY CROSSING OF RAILROAD.

The power of the public service commission to require a railroad, at its expense, to install gates at highway crossings, originally applicable to manually-operated gates *held,* sufficiently broad to empower the commission to order the installation of automatic track-circuit-operated half-roadway gates not requiring the presence of a watchman (CL 1948, §§ 466.2–466.4).

13. RAILROADS — STATUTES — REPEAL BY IMPLICATION — CROSSING GATES.

Provisions of 1873 act empowering railroad commissioner to require railroads to install gates at highway crossings solely at their own expense, contained in railroad incorporation act *held,* not repealed by implication by various other subsequent statutes amending a parallel act and not shown to be inconsistent or repugnant to the railroad incorporation act (PA 1873, No 79; PA 1907, No 312, §§ 35, 37, 38; PA 1909, No 300, §§ 35, 37, 38; PA 1925, No 178; PA 1927, No 117; PA 1931, No 336; CL 1948, §§ 466.2–466.4, 469.8).

14. SAME—STATUTES—REPEAL BY IMPLICATION—CROSSING GATES.

The statute relating to public safety at railroad crossings, not having occupied the entire field of grade-crossing protection, did not impliedly repeal provision of previously-enacted railroad incorporation act with respect to installation of gates at such crossings at the railroad's expense, where the provisions of the 2 acts were not inconsistent nor repugnant in such respect (CL 1948, §§ 466.2–466.4, 469.8).

15. STATUTES—REPEAL BY IMPLICATION.

Repeal of a previously-enacted statute by implication by a subsequently-enacted statute may be effected when the intention of the legislature to effect such a repeal is clear either by a statute that is inconsistent or that occupies the entire field involved, but repeals by implication are not favored.

16. SAME—CONSTRUCTION.

A statute is to be strictly construed to effectuate its consistent operation with previous legislation, where the repealing effect of a statute is doubtful.

17. Same—Disuse.

Statutes do not wither by disuse.

18. Public Service Commissions—Discretion—Highway Crossing of Railroad.

The kind and character of the protection of the public that is to be erected at railroad crossings is left to the sound judgment and discretion of the public service commission and may be in the form of warning signals, bells or by the erection of crossing gates (CL 1948, §§ 466.2–466.4, 469.8).

19. Railroads—Existing Highway Crossing—Gates.

The cost of installation of automatic half-roadway gates at an existing highway crossing of a railroad is at the sole expense of the railroad involved, such topic not being entirely covered by subsequent act relative to public protection at highway crossings under which flashing light signals may be required with the cost therefor shared by the railroad and highway authorities concerned (CL 1948, §§ 466.2–466.4, 469.8).

20. Costs—Public Question—Railroad Crossing Gates.

No costs are awarded on appeal in suits against the public service commission relative to the powers of the commission with respect to the installation of half-roadway gates at railroad crossings, a public question being involved (CL 1948, §§ 466.2–466.4).

Appeal from Ingham; Coash (Louis E.), J. Submitted April 9, 1957. (Dockets Nos. 40, 41, Calendar Nos. 47,169, 47,168.) Decided October 7, 1957. Rehearing denied November 26, 1957.

Separate bills, consolidated for hearing and appeal, by Board of County Road Commissioners of the County of Washtenaw and the New York Central Railroad Company, a Michigan corporation, against the Michigan Public Service Commission to set aside order for erection of half-roadway gates at railroad crossing with cost to be borne equally by road commission and railroad. Bills dismissed. Plaintiffs appeal. Modified and remanded for entry of order directing cost to be borne by railroad.

*Laird & Laird,* for plaintiff county board of road commissioners.

*Grey K. Nelson* (*G. H. Wyatt* and *J. I. Alspector,* of counsel), for plaintiff railroad.

*Thomas M. Kavanagh,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *Robert A. Derengoski* and *John E. Tormey,* Assistants Attorney General, for defendant.

EDWARDS, J.  These appeals concern the question of whether the Michigan public service commission has the power to order the railroads doing business in this State to install gates at dangerous railroad grade crossings and, if so, upon whom the costs must fall.

In 1873 the legislature passed the railroad incorporation act.  Three sections of this act authorized the railroad commissioner of the State to order railroads to construct and operate railroad crossing gates at highway grade crossings where necessity therefor was found.  The cost of installation and operation was by implication placed exclusively on the railroads to whom the orders were directed.

Three facts are undisputed.  The railroad incorporation act has never been repealed.  The 3 sections cited have never been removed from the act by specific repeal.  The Michigan public service commission (defendant herein) has succeeded to the powers previously held by the railroad commissioner.

In this case the Michigan public service commission seeks to require the New York Central Railroad Company to erect modern automatic short-arm gates at a certain grade crossing in Washtenaw county, and to divide the cost of the installation and operation equally between the plaintiffs New York Central Railroad Company and the board of county road

commissioners of the county of Washtenaw. The Michigan public service commission bases its claim for authority in relation to this order largely upon the terms of the 1873 act. Plaintiffs herein, the railroad and the road commission, contended before the Ingham circuit court that the disputed sections have long since been repealed by implication. In addition, they asserted that, in relation to the particular grade crossing involved, the record disclosed no support for the Michigan public service commission's finding of necessity for the gates. Each plaintiff likewise denied that the commission, as to it, had any statutory authority to order payment of costs.

The Ingham circuit court found for the defendant Michigan public service commission on all points and entered decrees dismissing both bills of complaint, whereupon plaintiffs appealed to this Court.

While we find many acts and amendments subsequent to 1873 which deal with grade-crossing protection, we do not find either the claimed inconsistency or such occupancy of the field as to warrant a finding of repeal by implication. A power as important as this in terms of public safety should not be held to be removed without legislation which, either in specific terms or by plain implication, clearly reveals the legislative intent to repeal.

Further, we hold that the record shows ample justification for the public service commission's finding of necessity for gates at this particular crossing. However, since the statute construed makes no grant of power to the commission to divide the costs of the installation and the disputed sections of the act have never been amended in this regard, the costs must fall upon the railroad.

The Michigan public service commission's order was issued December 6, 1955, after a hearing at the Ypsilanti city hall on November 14, 1955. Its terms, in more detail, directed the New York Central Rail-

road Company to install, maintain and operate automatic flasher signals as well as half-roadway gates at the Superior road crossing over the New York Central double-track main lines in Washtenaw county. The order further provided for the expense of both safety devices to be borne 50% by the Washtenaw county road commission and 50% by the New York Central Railroad.

Neither appellant complained about the portion of the order requiring installation of flasher signals at this crossing and equal allocation of the cost therefor.

Both appellants filed petitions for rehearing, which were denied by the commission on January 19, 1956. Both appellants then filed bills of complaint in the Ingham county circuit court to vacate and set aside that portion of the order referring to installation of half-roadway gates and allocation of cost therefor. On consolidated hearing of these matters before Judge Coash, decrees dismissing the bills of complaint were entered, from which these appeals are taken.

We deal first with the question of whether or not the commission had before it sufficient evidence for a finding of public necessity in relation to the ordering of half-roadway gates. In spite of contrary appearances, we doubt that this ground for appeal is seriously urged. Neither appellant presented any evidence before the public service commission or the circuit court. Further, the testimony before the public service commission on the part of the sheriff of Washtenaw county is totally unrefuted: "I would favor half-roadway gates because this is one of the most dangerous crossings in the county due to the visibility and the curve in the railroad, but I think gates would be very beneficial, especially if any trains meet at this crossing." So, likewise, is his testimony as to a grade-crossing accident at this

crossing in October, 1955, resulting in 2 fatalities, and a grade-crossing accident in December, 1954, involving 2 serious injuries.

The case for the installation was contained principally in the expert testimony of Mr. Donald W. Hughes, railroad safety inspector for the public service commission. His testimony bore particularly upon the problems of visibility at this particular crossing and the problem posed by the double-track operation over Superior road, which, in his opinion, could not be met by flasher signal installation alone. Pertinent portions of Mr. Hughes' testimony follow:

"I have made 2 inspections at the Superior road crossing over the 2 main tracks of The New York Central Railroad Company in Washtenaw county; 1 of these inspections was made on February 3, 1954, and the second on July 11, 1955. Present at these inspections were representatives of the Michigan State police, Superior township, the Washtenaw county road commission and the New York Central. The 2 main tracks of the New York Central and the Superior road cross at about a 70-degree angle. The road runs north and south and the tracks run northwesterly-southwesterly. The tracks are on a level grade. The road is on an ascending grade from south to north. There is about a 1.13-degree curve in the railroad tracks west of the crossing and there is a short curvature in the road about 300 feet south of the crossing. The topography of the land in the area is rolling. There are several obstructions to view at this crossing. In the northwest quadrant, there is an embankment along the north line of the railroad which continues west for about 1,500 feet. This embankment is lined with trees and underbrush from 6 to 16 feet in height. There is a field in the northeast quadrant which contains some trees and underbrush, and humps of earth 4 to 7 or 8 feet in height, and their height would be extended to the extent of snow or weeds gathered on top of them.

There is little or no sight distance for the driver of a vehicle driving south on Superior road in attempting to determine whether there is a train approaching from the west. There also is no minimum adequate view of an approaching train for a driver proceeding south on Superior road in attempting to determine whether there is a train approaching from the east.

"The southwest quadrant at the crossing contains a stand of trees and a dwelling house with a garage, and underbrush and trees line the south line of the railroad for a considerable distance west of the crossing. There is no adequate sight distance for a driver proceeding north on Superior road in attempting to determine whether there is an approaching eastbound New York Central train. The southeast quadrant provides about 50% clear vision. There is a stand of brush and small trees sprinkled throughout the field in that quadrant and the view of the railroad is intermittent. The view is further reduced during the summertime when the trees and underbrush are leafed out.

"I submitted to the Michigan public service commission a written report of my first inspection, which was dated March 1, 1954. In my report I recommended that if the view of the approaching trains could not be improved to the satisfaction of the roadway, township and railroad authorities and the State police, then an installation of automatic flashing-light signals and half-roadway gates should be made at the crossing to provide for the future safety of the traveling public.   *   *   *

"The matter of half-road gates was brought into the picture automatically. These gates extend from the signal mast to the center of the roadway leaving the opposing lane open. They work in conjunction with the flashing-light signals and are controlled by the same control devices. Where there is a second or third or more multiple track, trains can and will pass each other going either in the same or opposite directions. Every railroad signal engineer in the United States and most of the roadway authorities have known for at least 18 years that the only way

to prevent that second track accident is to add a gate to the signals."

Mr. Hughes' testimony was confirmed, not only by Sheriff Klager, but also by 2 Michigan State police officers who had inspected the crossing. No contrary testimony of any kind was offered.

The commission's finding, as contained in the conclusion of its order, is as follows:

"The commission, after due consideration of the testimony presented, and being advised of its authority in the matter, finds and holds:

"(1) That the crossing is dangerous;

"(2) That public interest and safety require automatically operated flashing-light signals;

"(3) That the public safety requires additional protection;

"(4) That the public interest requires that half-roadway gates supplement the automatic flashing-light signals."

We agree with the court below that the record does contain substantial evidence supporting the finding of the commission as to the need for half-roadway gates. We have previously held that the courts have no power to substitute their judgment on matters of fact for the judgment of the public service commission, where it is supported by substantial evidence. *Lafayette Transfer & Storage Co.* v. *Michigan Public Utilities Commission,* 287 Mich 488 (28 PUR NS 455); *City of Detroit* v. *Michigan Railroad Commission,* 209 Mich 395 (PUR1920D, 867).

A considerably more serious legal problem is posed by appellants' contention that the public service commission was without statutory authority as to its half-roadway gate order. The commission's answer relies upon 3 statutes and an opinion of this Court wherein by dictum we seem to have supported such authority. The 3 statutes relied upon by the commission are:

1. PA 1909, No 300, § 44 (CL 1948, § 462.44 [Stat Ann § 22.62]);

2. PA 1921, No 270, § 8, as amended by PA 1931, No 336 (CL 1948, § 469.8 [Stat Ann § 22.768]);

3. PA 1873, No 198, art 4, §§ 2, 3 and 4, as amended (CL 1948 §§ 466.2, 466.3, 466.4 [Stat Ann §§ 22.261, 22.262, 22.263]).

As to the first 2 of these statutes, we have reviewed with care the claim of the commission that authority may be found in it for the order currently complained of and we find little merit therein. PA 1909, No 300, § 44, purports to vest the police powers of the State over railroads in the railroad commission, "to exercise the same in accordance with the requirements of the law." If, as the commission's brief claims, this language may be read standing alone as enabling the Michigan public service commission (successor to the railroad commission) to order railroads to make installations such as contemplated here at their own expense, it would represent a delegation of legislative authority beyond the constitutional power of the legislature. Police power over railroads is indeed placed by this act in the hands of the Michigan public service commission, but broad policies upon which the commission acts must be the subject of specific legislative declaration. *G. F. Redmond & Co.* v. *Michigan Securities Commission,* 222 Mich 1; *Mutual Film Corporation* v. *Industrial Commission of Ohio,* 236 US 230 (35 S Ct 387, 59 L ed 552, Ann Cas 1916C, 296); *People* v. *Babcock,* 343 Mich 671; *Wyandotte Savings Bank* v. *State Banking Commissioner,* 347 Mich 33.

The second of the statutes relied upon by the commission, PA 1921, No 270, § 8, as amended by PA 1931, No 336, is a specific legislative grant of authority to order the installation of flasher-light signals at railroad grade crossings, and to order the allocation of costs between the railroad and the highway

authorities concerned, in this instance the county road commission. No express power to order installation of gates is contained therein. It is plaintiff road commission's contention here that the grant of authority to order the installation of flasher lights carries with it the authority to order automatic half-roadway gates as an adjunct of the flasher light signals. In view of the fact that this record discloses that the addition of automatic half-roadway gates to the installation of flasher lights adds approximately 100% to the total cost, it seems hardly logical to assume that the gates can be regarded as a mere adjunct.

We turn then to the third of these statutes, PA 1873, No 198, art 4, §§ 2, 3 and 4, as amended (CL 1948, §§ 466.2, 466.3, 466.4 [Stat Ann §§ 22.261, 22.262, 22.263]), consideration of which we regard as decisive of the present litigation. Sections 2 and 3 provided:

"Sec. 2. On and after July 31, 1873, every company, person or corporation owning or operating a railroad within this State, shall construct and maintain a gate or gates, or bridge, or maintain a flagman to signal trains at every highway or street crossing on the line of such road, where the same shall be required by the commissioner of railroads, as hereinafter provided. Any company, person, or corporation neglecting or refusing to construct or maintain such gate or gates or bridge, or to maintain such flagman where so required as aforesaid, shall forfeit for every such neglect or refusal the sum of $100, and the further sum of $10 for every day while such neglect or refusal shall continue.

"Sec. 3. Whenever, in the opinion of the commissioner of railroads, the public interests require that a gate be constructed and maintained at any railroad crossing, or a bridge be built over such railway at such crossing, or that a flagman be stationed and maintained at such crossing, he shall give to the

superintendent of such railroads a written notice that the same is required; and such company, person or corporation shall construct or maintain the same within such time thereafter as said commissioner shall prescribe."

As previously noted, it is undisputed that the Michigan public service commission has succeeded to the functions and authority previously held by the railroad commissioner. CL 1948, § 462.44 (Stat Ann § 22.62); CLS 1956, § 460.53 (Stat Ann 1955 Cum Supp § 22.3). We find little difficulty in reading the sections above in holding that they establish both the duty upon the railroad under certain circumstances to install gates at grade crossings, and the power in the Michigan public service commission to order same. We further believe that the title of the railroad incorporation act is broad enough to encompass both purposes. We reject as specious the argument of appellant railroad that section 3 as quoted above does not convey power to the commissioner of railroads, and his successor Michigan public service commission, to require installation of gates at highway grade crossings of railroad lines. The term "railroad crossing" is normal language for the crossing at grade of a highway and a railroad. *Murphy* v. *Palmer,* 73 RI 182, 189 (54 A2d 427, 431). Under statutory requirement the term is posted at every highway crossing of a railroad in this State. CLS 1956, § 469.5 (Stat Ann 1955 Cum Supp § 22.765).

In the context of section 3, particularly in its relationship to sections 2 and 4, it can be read logically in no other fashion. In the ingenious argument advanced by appellant railroad company that the term "railroad crossing" in section 3 may be interpreted only as referring to the crossing of 2 railroads, no suggestion is made to us as to how these 3 sections may be construed together. It is interesting to note

that section 4 in discussing "all gates constructed under this act," contains the language "at every gate heretofore or hereafter constructed at any crossing of a street or highway and a railroad," et cetera.

Further, the power to require the installation by the railroad manifestly meant at the cost of the railroad, since any other interpretation would have meant that the authority given was meaningless. *Detroit, Ft. Wayne & Belle Isle Railway* v. *Commissioner of Railroads*, 127 Mich 219 (62 LRA 149).

Nor do we agree with the plaintiff railroad company's argument that section 4 of the above-cited statute pertaining to the construction and operation of gates, which plainly in that year contemplated manual operation of roadway gates by a watchman, represents such a different grant of power as to invalidate the present order for the installation of automatic track-circuit-operated half-roadway gates. It is plain from this record that in 1873 no such automatic device was known. Yet the language employed calls for wide discretion in the State agency empowered to order the gates in relation to approving manner and material of construction and location of the gates. Similarly, the presence or absence of a watchman is placed at the discretion of the State agency, and the information contained in this record pertaining to the operation of automatic track-circuit-operated short-arm gates plainly warrants the commission in waiving any watchman requirement.

The last of the legal problems with which we have to deal pertains to plaintiffs-appellants' argument that the statute which we have just quoted and construed has been repealed by implication. In this regard appellants contend:

"Sections 35, 37 and 38 of PA 1907, No 312 and sections 35, 37 and 38 of PA 1909, No 300, covered the whole field of the subject matters dealt with in section 17 of PA 1873, No 79 and sections 2, 3 and 4

of article 4 of PA 1873, No 198. PA 1909, No 300, also specifically repealed the 1873 railroad commissioner act (Act No 79) and all other acts and parts of acts contravening the 1909 act's provisions. * * *

"In PA 1925, No 178, PA 1927, No 117, sweeping amendments were made to section 35 of PA 1909, No 300, as noted earlier. There can be no question but that the legislature, in adopting these amendments, intended to cover the whole field of crossing protection. * * *

"In 1931, by PA 1931, No 336, the legislature repealed section 35 of PA 1909, No 300, and adopted an exclusive standard of crossing protection: side-of-street flashing light signals."*

We have reviewed with care each of the acts and amendments relied upon by appellants. It should be noted that no claim is advanced that any one of these specifically repealed the 3 sections of PA 1873, No 198, art 4, §§ 2, 3 and 4, which we have been discussing. Nor is there any inconsistency or repugnance between the terms of PA 1873, No 198, art 4, §§ 2, 3 and 4 and any of the other acts or amendments relied upon, pointed out to us, or found by us in our review.

What does appear to be the situation is that in the railroad commissioner act (PA 1873, No 79 [How Stat 1882, § 3285 *et seq.*]), adopted in the same session of the legislature in 1873 which adopted the railroad incorporation act and its crossing gate provisions, there was included a parallel section (section 17, as amended by PA 1875, No 91 [How Stat 1882, § 3301]), which in general language empowered the commissioner of railroads to direct railroads to station a flagman, or erect a bridge, or erect and maintain a gate at any highway or street crossing of its tracks. With some amendments, the general structure of this parallel section, and the power as

---

* See CL 1948, § 469.8 (Stat Ann § 22.768).

to gates contained therein, was carried forward by repeal and re-enactment into PA 1907, No 312, § 35; and thence into PA 1909, No 300, § 35 (CL 1915, § 8143); and thence into PA 1925, No 178, amending section 35 of PA 1909, No 300; and thence into PA 1927, No 117, amending section 35 of PA 1909, No 300 (CL 1929, § 11051).

At this point, section 35 of PA 1909, No 300, as amended in 1925 and 1927, was repealed by PA 1931, No 336 (CL 1948, § 469.8 [Stat Ann § 22.768]), which was itself an amendment to section 8, PA 1921, No 270, entitled:

"An act to promote the public safety and make more safe crossings of streets and highways with railroads and railways."

The pertinent language in this last enactment is as follows:

"When in the discretion of the Michigan public utilities commission the safety of the public shall hereafter require that some protection device or improvement in existing devices be provided at a railway crossing to warn of the approach of trains about to cross the highway, it shall be the duty of the Michigan public utilities commission and it is hereby empowered to order the railway authorities owning the tracks of such crossings to provide protection of a flashing light type equipped with a gong of approved type at each signal."

In this re-enactment of a substitute for the repealed parallel section, the legislature for the first time omitted reference to power on the part of the Michigan public service commission to order installation of crossing gates.

It seems obvious to us that through all the sequence of events referred to above up to PA 1931, No 336, a general power to order the installation of crossing gates had been carried forward, paralleling the more detailed powers spelled out in the railroad incorpora-

tion act which is our current subject of concern. Essentially, the same relationship between the railroad gate provisions contained in the railroad incorporation act and the parallel provisions in the railroad commissioner act of 1873 was maintained down to the 1931 amendment. Since the first 2 in this series were passed within 21 days of each other, by the same legislature and may be read with complete harmony, we find no reason to read them as inconsistent, nor do we find any inconsistency or repugnance which would suggest repeal by implication in any of the other acts or amendments down to PA 1931, No 336.

Our sole remaining question then pertains to the effect of PA 1931, No 336. Again, it is conceded that it contains no specific repealing provision as to PA 1873, No 198, art 4, §§ 2, 3 and 4. Again, no inconsistency between its provisions for automatic flasher signals and the description thereof and the allocation of cost therefor and the terms of PA 1873, No 198, art 4, §§ 2, 3 and 4, is pointed out to us.

It is suggested that since this last enactment and the chapter which it amended (PA 1921, No 270) occupy the entire field of grade-crossing protection, this would accomplish repeal by implication. A quick comparison of the railroad incorporation act and the railroad maintenance of way act indicates conclusively that the latter does not encompass the whole field of railroad grade-crossing protection. PA 1873, No 198, is very much a part of the law of this State. It specifies the organization of railroad companies, their corporate powers and duties, and in article 4 contains many police regulations relating thereto. The use of bells and whistles on engines at highway crossings, the provision of signal boards at highway crossings, is covered by article 4, §13 of this act (CLS 1956, § 466.13 [Stat Ann 1955 Cum Supp § 22.272]). This section might be subject to much the same argu-

ment of repeal by implication by PA 1931, No 336, as are the currently-considered sections 2, 3 and 4 of the same act. It is interesting to note, however, that it was last amended by the legislature in 1949 by PA 1949, No 89.

Other provisions pertaining to grade crossings contained in the railroad incorporation act may be found in section 15 (CL 1948, § 466.15 [Stat Ann § 22.274]) and in section 22 (CL 1948, § 466.22 [Stat Ann § 22.281]).

We recognize as good law the principles argued to us by appellants herein pertaining to repeal by implication. When the intention of the legislature is clear, repeal by implication may be accomplished by the enactment of a subsequent act inconsistent with a former act. *People* v. *Bussell,* 59 Mich 104; *Jackson* v. *Michigan Corrections Commission,* 313 Mich 352; *Southward* v. *Wabash R. Co.,* 331 Mich 138. Where the legislative intent is clear, repeal by implication may be likewise achieved by the occupancy of the entire field by a subsequent enactment. *Attorney General, ex rel. Fuller,* v. *Parsell,* 100 Mich 170; *People* v. *Marxhausen,* 204 Mich 559 (3 ALR 1505). Our difficulty with the cases urged upon us as to these principles by appellants is that, as noted, we find neither clear intention on the part of the legislature, nor inconsistency and repugnance between the former statute and the latter, nor occupation of the complete field by the latter.

Repeals by implication are not favored.

"The interpretation of statutes which may achieve a repeal by implication of an existing law is premised upon the policy that the customary existent law is not presumed to be altered or repealed by subsequent legislation which does not expressly revoke the older and traditional law. The bent of the rules of interpretation and construction is to give harmonious operation and effect to all of the acts upon a subject,

where such a construction is reasonably possible, even to the extent of superimposing a construction of consistency upon the apparent legislative intent to repeal, where 2 acts can, in fact, stand together and be given a coterminous operation.   Where the repealing effect of a statute is doubtful, the statute is to be strictly construed to effectuate its *consistent* operation with previous legislation."   1 Sutherland, Statutory Construction (3d ed), § 2014.

See, also, *People* v. *Buckley,* 302 Mich 12; *People* v. *Stanley,* 344 Mich 530; *Attorney General, ex rel. Owen,* v. *Joyce,* 233 Mich 619.

Closest in point to the statutory problem currently under consideration is a Michigan case which construed the relationship between a pre-existing act and the prison reorganization act attacked and upheld in *Attorney General, ex rel. Fuller,* v. *Parsell, supra.*   In *People* v. *Huntley,* 112 Mich 569, 578, 579, a unanimous Court said as follows:

"But it is contended by counsel for respondents that this section of the act of 1887 was repealed by PA 1893, No 118.   The act of 1893 was a revision and consolidation of the former acts, and to repeal all acts inconsistent therewith.   While the general rule is that statutes and parts of statutes omitted from a revision are to be considered annulled, and not to be revived by construction, yet there are many exceptions to this rule.   A revisal repealing all acts repugnant to the provisions thereof cannot affect statutes which are omitted, and which are not repugnant to its provisions.   *State* v. *Pollard,* 6 RI 290.   The rule of implied repeal is clearly inapplicable also where the revising statute declares what effect it is intended to have upon the former law, as where it declares that it shall operate as a repeal of such provisions of earlier acts as are inconsistent with it, which is regarded as a declaration that it shall repeal only such provisions, and leave unaffected such as are not inconsistent.   Endlich, Interpretation of

Statutes, § 203; *Patterson* v. *Tatum* (USDC Cal), 3 Sawy 164; *Lewis* v. *Stout,* 22 Wis 234; *Gaston* v. *Merriam,* 33 Minn 271 (22 NW 614). Applying these rules to the present case, it must be held that section 3 of the act of 1887 was not repealed. The court therefore had power to impose the sentence, commencing after the former sentence shall have expired."

See, also, *Edwards* v. *Auditor General,* 161 Mich 639; *In re Bushey,* 105 Mich 64; *People* v. *Hanrahan,* 75 Mich 611 (4 LRA 751).

Finally, appellants contend to us that in the interval between 1931 and the present date there is evidence that the Michigan public service commission has considered itself to be without power to order the installation of railroad gates at grade crossings. The immediate answer to this is, of course, that statutes do not wither by disuse. 1 Sutherland, Statutory Construction (3d ed), § 2034. We may, however, likewise point to clear-cut language in the case decided by this Court in 1940 which specifically said the contrary although we recognize that the paragraph in question was dicta:

"The State has acted for the protection of passengers at railroad crossings and has prescribed the erection of crossing gates for the care and protection of those passengers who might be injured by the want of some protection. The kind and character of the protection that is to be erected at railroad crossings is left to the sound judgment and discretion of the Michigan public service commission and it is based upon the reasonableness of the protection to be afforded and may be in the form of warning signals, bells, or by the erection of crossing gates." *Perch* v. *New York Central R. Co.,* 294 Mich 227, 235.

In still other negligence cases arising after 1931 this Court has recognized the continued existence of a State power to order railroad crossing gates.

*Momany* v. *Pere Marquette R. Co.,* 282 Mich 168; *Bishop* v. *New York Central R. Co.,* 348 Mich 345.

In the prevailing opinion in the latter case (signed by 3 present Justices of this Court and concurred in by 3 others) we find the following (p 355):

"This was a protected crossing where by statute and order of the Michigan public service commission defendant was required to maintain and operate safety gates for the specific protection of the public. CL 1948, § 466.2 *et seq.* (Stat Ann § 22.261 *et seq.*)."

The statute cited above is the very one which we here construe. No case is cited to us by appellants, nor do we find any, wherein this Court has specifically or by implication held a contrary view.

Thus we agree with the circuit judge that the defendant Michigan public service commission had both statutory authority and adequate evidence of public necessity for the order for automatic gates at the Superior road-New York Central crossing in Washtenaw county.

We cannot agree, however, with his approval of that portion of the commission order which divided the costs for this installation equally between the plaintiffs, railroad and road commission. We do not believe that the language of PA 1931, No 336, allocating costs of flasher-signal installation between railroads and road commissions can be read as authorizing this formula for the installation of gates which is not a topic covered by this act.

We have previously noted that PA 1873, No 198, called for the railroads to install crossing gates at the expense of the railroad. Further, we do not find a consistent pattern of allocation of grade-crossing costs adopted by the legislature since then. Different formulae for the payment of costs involved in grade-crossing protection may be found in different instances.

Thus the railroads must pay the full cost of maintaining the grade crossing up to 1 foot beyond the ties as well as bearing the full costs of sign boards (in certain instances) and train bell or whistle warnings. PA 1921, No 270, § 1, as amended (CL 1948, § 469.1 [Stat Ann § 22.761]); PA 1873, No 198, art 4, § 13, as amended by PA 1949, No 89 (CLS 1956, § 466.13 [Stat Ann 1955 Cum Supp § 22.272]); PA 1923, No 158, § 1 (CL 1948, § 469.111 [Stat Ann § 22.851]). The highway authorities must, on the other hand, bear the full cost of maintaining clearvision areas at crossings, of installing barriers and (in certain instances) of installing warning signs. PA 1921, No 270, § 7, as amended (CL 1948, § 469.7 [Stat Ann § 22.767]); PA 1937, No 295, § 4 (CL 1948, § 247.314 [Stat Ann 1955 Cum Supp § 9.1423 (4)]); PA 1921, No 270, § 3, as amended (CL 1948, § 469.3 [Stat Ann § 22.763]).

In addition, the legislature has provided for dividing costs equally as to warning signs (in certain instances) and as to flasher signals. PA 1921, No 270, § 5, as amended (CLS 1956, § 469.5 [Stat Ann 1955 Cum Supp § 22.765]); PA 1921, No 270, § 8 (CL 1948, § 469. 8 [Stat Ann § 22.768]).

In spite of the above, it may well be, as argued to us by the railroad and the Michigan public service commission, that the present intention of the legislature in relation to allocation of costs is shown in the provisions of PA 1931, No 336, allocating the cost of flasher signals equally between the railroad and the road commission. If, indeed, this is the intention of the legislature, it may be, and doubtless will be, given prompt effect by proper amendment.

The 2 equity matters which we have dealt with in these consolidated appeals will be remanded to the circuit court for modification of the orders previously entered, in accordance with this opinion.

No costs will be awarded, a public question being involved.

DETHMERS, C. J., and SHARPE, VOELKER, KELLY, CARR, and BLACK, JJ., concurred.

SMITH, J., did not sit.