McCORMACK, J.
odissenting). I respectfully dissent because I conclude that the Michigan Business Tax Act (BTA), MCL 208.1101 et seq., requires taxpayers to apportion their multistate income in accordance with the BTA’s sales-only apportionment formula and without resort to the Multistate Tax Compact’s election provision. I reach this result because the Legislature’s *671 command — “each tax base established under this act shall be apportioned in accordance with this chapter,” MCL 208.1301(1) (emphasis added) — is plain, unambiguous, and permits only one interpretation. Further, there is no constitutional barrier that prevents the Legislature from making the Compact’s alternative election provision unavailable to taxpayers. I would affirm the judgment of the Court of Appeals.
I. AN IRRECONCILABLE CONFLICT OF STATUTES
The threshold issue is, at its core, one of statutory interpretation. When the language of a statute is unambiguous, we give effect to its plain meaning. Ter Beek v City of Wyoming, 495 Mich 1, 8; 846 NW2d 531 (2014). It is hard to imagine a more unambiguous command than the mandatory directive found in § 301 of the BTA: “Except as otherwise provided in this act, each tax base established under this act shall be apportioned in accordance with this chapter.” MCL 208.1301(1). There is no “otherwise provided” exception in the BTA that would aid IBM in its attempt to avoid the statute’s sales-only apportionment requirement. And, within Chapter 208 of the Michigan Compiled Laws, it is the BTA alone that provides the formula by which taxpayers are to apportion their multistate income. See MCL 208.1301(2); MCL 208.1303(1). Neither the Compact nor its apportionment provisions are referred to anywhere in the BTA.
I share the lead opinion’s view that we must make every attempt “to construe statutes, claimed to be in conflict, harmoniously[.]” Wayne Co Prosecutor v Dep’t of Corrections, 451 Mich 569, 577; 548 NW2d 900 (1996).[1] When later enacted legislation irreconcilably *672 conflicts with a prior act, however, “the last expression of the legislative will must control.” Jackson v Mich Corrections Comm, 313 Mich 352, 356; 21 NW2d 159 (1946).
Section 301(1) of the BTA directs that taxes established under the BTA be apportioned “in accordance with this chapter.” “[T]his chapter” requires taxpayers to use a sales-only apportionment formula.* [2] 3The Compact, however, provides that “[a]ny taxpayer subject to an income tax[3]. . . may elect to apportion” its income in accordance with the Compact’s three-factor apportionment formula. MCL 205.581, Art III(l). Reading these provisions side by side, I see two, and only two, possible results: either taxes established under the BTA need not be apportioned “in accordance with this chapter,” as § 301 demands, or taxpayers may not elect to use the Compact formula to apportion tax bases established under the BTA. While I agree with the lead opinion that statutes that appear to be conflict should be read together and reconciled, if reasonably possible, Rathbun v State of Michigan, 284 Mich 521, 544; 280 NW 35 (1938), I disagree that this is a case where reconciliation is possible. The differing opinions offered *673 by this Court here make the underlying conflict undeniably plain. The Compact and the BTA are irreconcilably in conflict; one statute — either the Compact or the BTA — must prevail over the other. And neither alternative is easily dismissed. Traditional rules of construction lead me to resolve the conflict in favor of the later enacted and more specific legislation. See Kalamazoo v KTS Indus, Inc, 263 Mich App 23, 38-39; 687 NW2d 319 (2004) (resolving a direct conflict between two statutes in favor of the subsequently enacted legislation).
The lead opinion agrees that the plain language of § 301 is mandatory. But it asserts that § 301 can nevertheless be interpreted as permitting taxpayers to make the Compact election. I do not see how this interpretation of the BTA is reasonable. If a taxpayer can elect an alternative apportionment formula, then § 301 is in no sense mandatory. Quite the opposite: § 301’s mandatory apportionment “in accordance with this chapter” becomes optional. By interpreting § 301 as permitting taxpayers to make the Compact election, the lead opinion has not, as it claims, settled on a harmonious construction of the BTA and the Compact. Rather, it has resolved the conflict in favor of the Compact, the earlier enacted statute. But our precedent is clear: when an irreconcilable conflict exists, as in this case, the later enacted legislation controls. Jackson, 313 Mich at 356; see also Washtenaw Co Rd Comm’rs v Pub Serv Comm, 349 Mich 663, 680; 85 NW2d 134 (1957). Because I am not convinced that the two statutes can be read harmoniously, I believe that, for tax years 2008 through 2010, the enactment of the BTA impliedly repealed the Compact’s election provision.
The lead opinion tries to give some effect to § 301 by stating that a taxpayer “must use the apportionment formula set forth in” the BTA if it does not make the *674 Compact election. Ante at 658. This construction does not make § 301’s mandatory directive “mandatory” at all. When a taxpayer is given a choice as to whether they will apportion their income in accordance with the BTA’s sales-only formula, the number of alternative options — a single one, or more — is irrelevant. As long as an alternative option exists, the taxpayer may, not must, use the apportionment formula set forth in the BTA. And once the lead opinion’s “mandatory” construction is revealed to be anything but that, I do not believe that the lead opinion has persuasively explained why the BTA did not impliedly amend or repeal the Compact’s election provision. Rather, the lead opinion, relying on the fact that the Legislature has expressly repealed and amended tax statutes in the past, simply states that “[h]ad the Legislature believed that the Compact’s election provision no longer had a place in Michigan’s tax system..., it could have taken the necessary action to eliminate the election provision.” Ante at 657. Because it did not, the lead opinion “proceed[s] under the assumption that the Legislature intended for [the Compact’s election provision] to remain in effect.” Ante at 657. This, of course, simply assumes the lead opinion’s conclusion that there was no repeal. Yes, repeals by implication are disfavored, and that the Legislature knows how to effect an express repeal is irrefutable. But by demanding that the Legislature take “the necessary action” — i.e., expressly amend or repeal the Compact — the lead opinion has elevated the presumption against implied repeals into an absolute bar.
Having failed to adequately explain why the statutory language itself permits the result it reaches, the lead opinion anchors its analysis in a historical overview of business taxation in Michigan. While informative, I find this approach ultimately unpersuasive. The lead opinion argues that because the Compact was enacted at a time when Michigan law applied the same three-factor appor *675 tionment formula as that provided in the Compact, the Legislature, in enacting it, must have anticipated the future enactment of a tax act requiring a different apportionment formula and intended for the Compact to prevail should a conflict arise. But even assuming that the lead opinion is correct, that interpretation reads into the Compact a policy choice by the 1970 Legislature that the 2008 Legislature was free to disagree with, either by enacting an income tax with a different, mandatory apportionment formula, as it did in 2008, or by repealing the election provision outright, as it did in 2011. See Studier v Mich Pub Sch Employees’ Retirement Bd, 472 Mich 642, 661; 698 NW2d 350 (2005) (“[A] fundamental principle of the jurisprudence of both the United States and this state is that one legislature cannot bind the power of a successive legislature.”).
The lead opinion underscores its error by attaching particular significance to 2011 PA 40, which expressly amended the Compact to make the election unavailable to BTA taxpayers beginning January 1, 2011. The effect of this amendment on tax years 2011 and beyond is plain to see, but whether the amendment lends force to IBM’s position in this dispute is not. In enacting this amendment, the 2011 Legislature may have simply been acting expressly to confirm what the 2007 Legislature believed it had already done implicitly. And even if the 2011 Legislature was expressing its view that the BTA did not, in fact, repeal the election provision, this Court is not bound by the prior Legislature’s construction of the earlier enactment. See Robertson v Baxter, 57 Mich 127, 132; 23 NW 711 (1885) (“Legislative construction of past legislation has no judicial force except for the future. But it is always entitled to be considered with some care, so far as it throws light on doubtful language, and for future cases it has authority.”); Frey v Mitchie, 68 Mich 323, 327; 36 NW 184 (1888) (“It is unnecessary to say more than that a *676 legislative interpretation of old laws has no judicial force. Whether right or wrong must be determined by the statutes themselves.”). The question we must answer in this case concerns what the Legislature intended when it enacted the BTA — not what it intended when it enacted the Compact forty years earlier or amended it three years later. While in answering this question the 2011 amendment may be considered “with some care, so far as it throws light on doubtful language,” Baxter, 57 Mich at 132, that light does not shine on the lead opinion’s argument.
In my view the BTA made the Compact election unavailable. Because the statutes are irreconcilably in conflict, the latter, as the more specific and later enacted statute, must be given effect over the former. For this reason, I disagree with the lead opinion that the BTA’s mandatory directive can be interpreted so as to allow BTA taxpayers to make the Compact election instead. As a result, I find it necessary to address IBM’s argument that the Legislature was not constitutionally permitted to make the BTA’s sales-only apportionment formula exclusive and mandatory without first repealing the Compact in its entirety.
II. THE LEGISLATURE WAS NOT BARRED FROM UNILATERALLY AMENDING THE COMPACT
IBM asks this Court to invoke the authority of “compact law” and hold that the Legislature, even had it intended to alter the Compact’s election provision when it enacted the BTA, was prohibited from doing so.[4] I would decline that invitation.
*677 The United States Constitution provides that “[n]o State shall, without the Consent of Congress . . . enter into any Agreement of Compact with another State[.]” US Const, art I, § 10, cl 3. As the Supreme Court explained in US Steel Corp v Multistate Tax Comm, 434 US 452; 98 S Ct 799; 54 L Ed 2d 682 (1978), the clause is not to be read strictly, but only as requiring congressional consent for compacts that tend to increase the political power of the states in a way that “may encroach upon or interfere with the just supremacy of the United States.” Id. at 471 (quotation marks and citation omitted). Those compacts that receive congressional authorization and fall within the scope of the Compact Clause are treated as federal law. Cuyler v Adams, 449 US 433, 440; 101 S Ct 703; 66 L Ed 2d 641 (1981). Compacts without congressional approval, however, are not transformed into federal law; thus their construction is a matter of state statutory law.
Notwithstanding the fact that the Multistate Tax Compact, as a compact without congressional approval, does not carry the supreme force of federal law, IBM believes that the Legislature could not impose an exclusive apportionment formula because the Compact supersedes conflicting state law in any event. This is contrary to our well-established rule that a statute can be amended, repealed, or superseded, in whole or in *678 part, expressly or impliedly, by a subsequently enacted statute. LeRoux v Secretary of State, 465 Mich 594, 615; 640 NW2d 849 (2002) (“Absent the creation of contract rights, the later Legislature is free to amend or repeal existing statutory provisions.”). The essence of IBM’s argument is that because a compact is an agreement between Michigan and the other member states, it is not like any other state law subject to traditional principles of statutory construction, but rather it has some greater force and authority. As a result, any variation from the Compact’s terms is strictly prohibited. In support of this proposition, IBM cites as persuasive authority McComb v Wambaugh, 934 F2d 474, 479 (CA 3, 1991), and CT Hellmuth & Assoc, Inc v Washington Metro Area Transit Auth, 414 F Supp 408, 409 (D Md, 1976). Neither case, in my view, supports such a rule.
In McComb, the plaintiff, as guardian ad litem for a minor child, brought a suit against the city of Philadelphia and its employees under 42 USC 1983. The suit sought damages for injuries the child suffered as a result of parental abuse. Before he was injured the child was under the protective custody of a Virginia court. The Virginia court ordered that the child be returned to his parental home in Philadelphia, where the abuse occurred. Plaintiff argued that the Virginia court order, in conjunction with the Interstate Compact for Placement of Children (ICPC), a compact to which Pennsylvania and Virginia are parties that had not been congressionally approved, extended the jurisdiction of the Virginia court into Pennsylvania and thereby imposed a legal duty on the Philadelphia social workers. The United States Court of Appeals for the Third Circuit rejected this argument, ultimately concluding that the ICPC did not apply when a child is returned by the *679 sending state to a natural parent residing in another state. McComb, 934 F2d at 482.
IBM cites the Third Circuit’s discussion of the scope of the ICPC for its argument here:
Because Congressional consent was neither given nor required, the [ICPC] does not express federal law. Consequently, this Compact must be construed as state law....
Nevertheless, uniformity of interpretation is important in the construction of a Compact because in some contexts it is a contract between the participating states. Having entered into a contract, a participant state may not unilaterally change its terms. A Compact also takes precedence over statutory law in member states. [McComb, 934 F2d at 479 (citations omitted; emphasis added).] *680 when enacted, a compact constitutes not only law, but a contract which may not be amended, modified, or otherwise altered without the consent of all parties. It, therefore, appears settled that one party may not enact legislation which would impose burdens upon the compact absent the concurrence of the other signatories. [CT Hellmuth, 414 F Supp at 409.]
*679 The McComb court did not cite any authority for the above emphasized rule — that compacts without congressional approval cannot be unilaterally amended and must take precedent over conflicting state law — and I have found none. Moreover, the unsupported statement contradicts the one that precedes it. Either the compact must be construed as state law or it must be construed as something with greater authority than state law, but the McComb court said both. Finally, this statement was dictum, because the court did not identify any potential conflict between the ICPC and Pennsylvania law and the court ultimately determined that the ICPC did not apply. Id. at 482.
In CT Hellmuth, the plaintiff sought to compel disclosure of documents under Maryland law. The defendant, an interstate agency formed by an interstate compact between Maryland, Virginia, and the District of Columbia, argued that its status as an interstate agency exempted it from the Maryland law. In granting the defendant’s motion for summary judgment, the court remarked that
*680 CT Hellmuth and the cases it relied upon, however, involved congressionally approved compacts, which, as explained, supersede subsequent state law by virtue of the Supremacy Clause. Cuyler, 449 US at 440.
IBM’s claim that the Compact trumps the BTA simply because of its status as a compact relies on the faulty premise that the distinction between compacts that have congressional approval and those that do not is unimportant, and that all compacts are immune to unilateral modification by their member states because “[a] Compact. . . takes precedence over statutory law in member states.” McComb, 934 F2d at 479. This assumes too much. Any immunity, if it exists, is a result of a compact’s dual nature as both state law and a contract among its member states. See Green v Biddle, 21 US (8 Wheat) 1; 5 L Ed 547 (1832) (recognizing that an interstate compact can be a contract). As a result the Legislature is free to amend or repeal an existing statutory provision as long as it does not impair a contractual obligation. LeRoux, 465 Mich at 615; see US Const, art I, § 10, cl 1; Const 1963, art 1, § 10. In other words, the Legislature is prohibited from unilaterally amending the Compact only if that amendment impairs contractual obligations created by the Compact itself. When viewed as a matter of contract law, I believe that it was within the Legislature’s power to require BTA taxpayers to apportion their multistate income solely in accordance with § 301.
*681 HI. UNILATERAL AMENDMENT OF MCL 205.581, ART 111(2) DOES NOT VIOLATE THE STATE OR FEDERAL CONTRACTS CLAUSE
In evaluating whether § 301 of the BTA unconstitutionally impairs a contract, the threshold question is whether the Compact did, in fact, create a contractual relationship in the first instance. I do not believe that it did. Two factors weigh heavily in this conclusion. First, the member states’ courses of conduct indicate that there is no contractual obligation to strictly adhere to Articles III and IV of the Compact. Second, the Compact is silent regarding a member state’s authority to enact exclusive apportionment formulas that differ from the Compact’s formula.
Starting with the obvious: taxpayers like IBM were not parties to the Compact. To the extent that the Compact can be viewed as a contract, it is an agreement between its member states, not between taxpayers and the states.[5] The Compact member states’ courses of performance are critical to understanding the nature of the agreement. As the Supreme Court recently explained, a party’s course of performance is “highly significant” evidence of the party’s understanding of the Compact’s terms. Tarrant Regional Water Dist v Hermann, 569 US_; 133 S Ct 2120, 2135; 186 L Ed 2d 153 (2013) (citation and quotation marks omitted).[6] Here, it is plain that the member states did not view *682 strict adherence to Articles III and IV as a binding contractual obligation, as Compact members have deviated from the Compact’s election provision and apportionment formula without objection from other members. Arkansas, for example, has retained the Compact’s election provision but changed the Compact formula to place additional emphasis on the sales factor. Ark Code 26-5-101, Art IV(9). Nondeviating members have not pursued actions against those states that have deviated, and no member state has intervened on IBM’s behalf in this case. Further, the Multistate Tax Commission — the organization charged with administering the Compact — has urged us to reject IBM’s rigid interpretation of the Compact. These facts weigh heavily in favor of rejecting IBM’s argument that the Compact creates a binding contractual obligation on its member states to refrain from amending the election provision.[7]
Deference to principles of state sovereignty leads me to the same conclusion. As this Court explained in Studier, 472 Mich at 661, there is a “strong presumption that statutes do not create contractual rights.” This presumption is grounded in the principle that “surrenders of legislative power are subject to strict limitations that have developed in order to protect the sovereign prerogatives of state governments.” Id. IBM has not overcome this presumption here. The Compact’s silence on the effect of a member state’s ability to elect an exclusive apportionment formula indicates that Michigan did not contract away its right to do exactly *683 that. Id. at 662. While it is true that the Compact does not expressly allow Michigan to adopt a different apportionment formula, neither does the Compact surrender the state’s right to do so. When the state’s sovereign power of taxation is implicated, as it is here, any uncertainty should be resolved in favor of concluding that the state did not cede that power. See Tarrant, 133 S Ct at 2132 (recognizing that states “do not easily cede their sovereign powers”). Admittedly, any sovereignty concerns are abated by the fact that a member state may withdraw from the Compact, unilaterally and without repercussion, at any time. MCL 205.581, Art X(2). But this withdrawal provision is equally strong evidence that the member states did not intend to be contractually bound, as it demonstrates the member states’ desire to retain control over their sovereignty with respect to taxation. Moreover, if continued participation in the Compact is, essentially, completely voluntary, I fail to see how its terms can be construed as creating binding contractual obligations, especially in light of the presumption against such an interpretation. Studier, 472 Mich at 661.[8]
IV CONCLUSION
I would affirm the judgment of the Court of Appeals because the Legislature expressly provided that taxes *684 established under the BTA “shall be in accordance with” the BTA’s sales-only apportionment formula. Allowing taxpayers to apportion their multistate income in accordance with the Compact’s formula violates this unambiguous directive. And because the state was not contractually obligated to allow taxpayers to make the Compact election, the BTA does not offend the state or federal constitutions.
J. Young, C.J., and Kelly, J., concurred with McCormack,

 The lead opinion implies that if the Compact is found to irreconcilably conflict with the BTA, the Compact, as the earlier enacted statute, will necessarily have been repealed by implication. Our caselaw does not *672 demand such a result. See Metro Life Ins Co v Stoll, 276 Mich 637, 641; 268 NW 763 (1936) (“It is the rule that where two laws in pari materia are in irreconcilable conflict, the one last enacted will control or be regarded as an exception to or qualification of the prior statute.”) In any event, regardless of whether the BTA impliedly repealed the Compact beginning January 1, 2008, the issue remains the same — whether the Compact election was available for tax years 2008 through 2010.

 Taxpayers may petition the Treasury to use an alternative apportionment method if the apportionment provisions of the BTA “do not fairly represent the extent of the taxpayer’s business activity in this state!.]” MCL 208.1309(1).

 I agree with the lead opinion that the tax bases at issue here are “income taxes” within the meaning of the Compact. MCL 205.581, Art IK4).

 To the extent that IBM is separately arguing that the Compact is a binding contract among its member states and that unilateral amendment of the Compact offends the Contract Clause, that argument is discussed later in this opinion. *677 The Cahfornia First District Court of Appeal recently decided this very issue in Gillette Co v Franchise Tax Bd, 209 Cal App 4th 938; 147 Cal Rptr 3d 603 (2012), review granted and opinion superseded suh nom Gillette v Franchise Tax Bd, 151 Cal Rptr 3d 106; 291 P3d 327 (2013). The Gillette Court held that “under established compact law, the [Multistate Tax] Compact superseded subsequent conflicting state law. . . [and] the federal and state Constitutions prohibit states from passing laws that impair the obligations of contracts.” Gillette, 147 Cal Rptr 3d at 615. For the reasons stated herein, I believe that Gillette was wrongly decided.

 While the Treasury has not made the argument in its brief on appeal, it is not entirely clear to me why IBM has standing to enforce the Compact as a contract, given that IBM is neither a party to the Compact nor is it clear that they were intended as a third-party beneficiary. See Schmalfeldt v North Pointe Ins Co, 469 Mich 422; 670 NW2d 651 (2003); MCL 600.1405. In any event, because I conclude that no such contractual relationship was formed, I find it unnecessary to address this issue sua sponte.

 Michigan law recognizes a similar principle. See Klapp v United Ins Group Agency, Inc, 468 Mich 459, 478-479; 663 NW2d 447 (2003).

 It bears emphasizing that Compact members have not only refrained from bringing legal action against one another for deviating from Articles III and iy they have endorsed the Commissioner’s interpretation of the Compact: in the Gillette litigation, all of the member states jointly filed an amicus brief urging the Supreme Court of California to reject the lower court’s construction of the Compact as a binding contract.

 In arguing that unilateral amendment of the Compact would offend the state and federal constitutions, IBM cites Green, 21 US 1, in which the Supreme Court analyzed an interstate compact under the Contract Clause, US Const, art I, § 10, cl 1. While I conclude that the Compact did not create a contractual obligation that precluded Michigan from unilaterally amending its election provision, it is important to note that the Supreme Court has since retreated from the “any deviation” standard it applied in Green. See US Trust Co v New Jersey, 431 US 1, 21; 97 S Ct 1505; 52 L Ed 2d 92 (1977). Because IBM does not engage these post-Green developments, it has failed to explain how a constitutional violation arises under a modern analysis.