*In re* THURSTON
(PEOPLE v SHIER)

Docket No. 184811. Submitted October 16, 1996, at Lansing. Decided October 31, 1997, at 9:00 A.M. Leave to appeal sought.

The Court of Appeals ordered Jane M. Thurston, an attorney, to appear before the Court to show cause why she should not be held in contempt because of false representations she made to the Court during oral argument while representing Robert L. Shier, Jr., in an appeal in a criminal matter. The order provided that, alternatively, Ms. Thurston could pay a fine of $250 to the Court before the date of the hearing. Ms. Thurston did not pay the fine before the date specified. The Court denied the respondent's motions to disqualify the entire panel, dismiss the matter, stay the matter, and waive fees. The Court appointed Joel M. Boyden to function as presenter of evidence and argument at the hearing regarding the order to show cause and any related proceedings.

The Court of Appeals *held*:

1. The presenter proved beyond a reasonable doubt that the statements attributed to the respondent during oral argument were false statements.

2. The statement that the defendant had been convicted of first-degree criminal sexual conduct "even though he never had sex with this woman" was a false statement of fact. The positive evidence of the respondent's wrongdoing overcomes the respondent's proof of her good character and truthfulness. The respondent is guilty of this count of contempt and must pay a fine of $250.

3. The statement that the complainant in her taped statements to the police "was laughing through the statements" in contrast with crying during the trial was a false statement. No nonfrivolous claim of audible laughter through the tape recordings can be made, while crying is plainly present. The respondent is guilty of misconduct amounting to contempt of court with regard to this count of contempt and must pay a fine of $250.

4. The respondent's contention that she has been subjected to selective prosecution and singled out for referral to the Attorney Grievance Administrator totally lacks merit.

5. The Court of Appeals has the inherent power to impose a civil remedial sanction where appropriate. Ordering the respondent to pay costs of $200 is an appropriate sanction in this case.

6. A copy of the Court's opinion must be forwarded by the Clerk of the Court of Appeals to the Attorney Grievance Administrator.

*Joel M. Boyden,* Presenter of Evidence and Argument.

Amici Curiae:

*James W. Burdick (Robyn B. Frankel, Mark J. Kriger,* and *Thomas W. Cranmer,* of Counsel), for National Association of Criminal Defense Lawyers.

*Frank D. Eaman, James C. Thomas,* and *Walter J. Piszczatowski,* for Criminal Defense Attorneys of Michigan.

Before: CORRIGAN, C.J., and TAYLOR and D. A. JOHNSTON, III*, JJ.

PER CURIAM.

### I. CASE HISTORY

This Court's unpublished opinion per curiam, reversing defendant's conviction, was released on June 24, 1997 (Docket No. 184811); the Michigan Supreme Court has denied the prosecutor's application for leave to appeal that decision.[1] In that opinion, this Court made the following comments in footnote 2:

The difficulty in resolving this appeal was compounded by the oral argument we heard in this case. Attorney Jane Thurston, who was representing defendant at the time,

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] 456 Mich 875 (1997).

made false representations to this Court. Ms. Thurston told this Court that defendant had been convicted of CSC I "even though he never had sex with this woman." This statement was patently false. Defendant gave two taped statements to the police and he admitted having consensual sex with the complainant in both statements. Consent was the defense at trial. The complainant clearly stated in her taped statements and again at trial that she had sex with defendant. There never has been any question that defendant and the complainant had sex. The only question was whether the sex was consensual. (The prosecutor inexplicably failed to advise this Court that Ms. Thurston's argument was patently false at oral argument). We further note that Ms. Thurston argued to this Court that trial counsel was ineffective because he did not have the complainant's taped statements to the police played for the jury to hear in that the complainant "was laughing through the statements" in contrast with crying during trial. This statement was false. We have listened to the two taped statements of the complainant and it certainly cannot be said that the complainant laughs throughout the taped statements. In fact, we note that the complainant can be heard crying twice during her second statement. We are deeply upset that an attorney would make such false representations to this Court during oral argument. We direct the Clerk of this Court to send a copy of this opinion to Ms. Thurston and to the Attorney Grievance Administrator for investigation and appropriate action because this portion of Ms. Thurston's argument appears to have been in violation of MRPC 3.1, 3.3 and 4.1. We order Ms. Thurston to appear before this Court on August 5, 1997 at 3:00 P.M. at the Court's Lansing third floor courtroom to show cause why she should not be held in contempt. MCL 600.1701(c); MSA 27A.1701(c); MCL 600.1715; MSA 27A.1715. *In re Oliver*, 333 US 257; 68 S Ct 499; 92 L Ed 682 (1948); *In re Scott*, 342 Mich 614, 622; 71 NW2d 71 (1955). See also *Chambers v NASCO*, 501 US 32; 111 S Ct 2123; 115 L Ed 2d 27 (1991). Alternatively, Ms. Thurston may pay a fine of $250 to this Court prior to said date.

In consequence of this portion of the opinion, a formal order to show cause, subsequently amended, was issued, and respondent Thurston opted to show cause in lieu of paying the suggested fine.[2] At the indicated time and place, after denying respondent's motion for disqualification of the entire panel,[3] an adjournment

---

[2] Although the present proceeding is unusual because it derives from the substance of an attorney's argument to this Court, contempt proceedings in this Court, involving both attorneys and court reporters, are fairly routinely conducted on a regular basis (a fact that we hope is as disturbing to the bar and the public as it is to this Court). Equally routinely, referrals in such cases are made to the Attorney Grievance Administrator or Court Reporting and Recording Board of Review, MCR 8.108(G)(2)(a). Adjudications of contempt prima facie constitute conclusive proof of the commission of a criminal offense, MCR 9.120(B)(2), and thus would appear to implicate the provisions of MCR 9.104(5), which declares that it is professional misconduct to engage in conduct violative of a criminal law of a state or of the United States. *Grievance Administrator v Deutch*, 455 Mich 149, 160 ff; 565 NW2d 369 (1977). For the attorneys, resulting disciplinary sanctions are regularly reported in the relevant section of the *Michigan Bar Journal*.

[3] As amended, the order denying the motion to disqualify said:

The motion to disqualify is DENIED.

First, the motion is untimely. Respondent Thurston was notified with the release of this Court's June 24, 1997 opinion that the time to show cause, if she so opted, was August 5, 1997. The asserted grounds for disqualification are internal to that opinion, and therefore a motion to disqualify had to be filed not later than 14 days after receipt of the opinion. MCR 2.003(C)(1); *People v Bettistea*, 173 Mich App 106; 434 NW2d 138 (1988); *Wayne County Jail Inmates v Wayne County Chief Executive Officer*, 178 Mich App 634; 444 NW2d 549 (1989). The motion was not presented to the Clerk of this Court until July 31, 1997, and the motion was not perfected and filed until August 1, 1997 when the filing fees were paid as required by MCR 7.211(A)(3).

Substantively, the asserted grounds for disqualification are without merit. Counsel for Ms. Thurston, citing *Mayberry v Pennsylvania*, 400 US 455, 466; 91 S Ct 499; 27 L Ed 2d 532, 540 (1971) and *People v Kurz*, 35 Mich App 643, 660; 192 NW2d 594 (1971), urges that the original panel members must all recuse themselves in the name of due process because of apparent bias. In criminal contempt, the constitution does not compel the judges who have initiated the contempt charges to disqualify themselves from presiding over the contempt proceedings, unless they have become so

personally embroiled with the alleged contemnor as to bias them to an unacceptable degree. *Ungar v Sarafite,* 376 US 575; 84 S Ct 841; 11 L Ed 2d 921 (1964). Unless an individual panel member, upon self-reflection, finds an inability to objectively consider on its merits any legal or factual defense Ms. Thurston may present, there is no need for disqualification, which of course foists the onerous task of calling a member of the bar to account for possible misdeeds onto one or more colleagues. None of the members of this panel is so disposed.

In clarifying the so-called "extrajudicial source doctrine" of disqualifying judicial bias, usually traced to *United States v Grinnell,* 384 US 563; 86 S Ct 1678; 16 L Ed 2d 978 (1966), the United States Supreme Court recently observed:

"Not *all* unfavorable disposition towards an individual (or his case) is properly described by those terms ['bias or prejudice']. One would not say, for example, that world opinion is biased or prejudiced against Adolf Hitler. The words connote a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate,* either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess (for example, a criminal juror who has been biased or prejudiced by receipt of inadmissible evidence concerning the defendant's prior criminal activities) or because it is excessive in degree (for example, a criminal juror who is so inflamed by properly admitted evidence of a defendant's prior criminal activities that he will vote guilty regardless of the facts). The 'extrajudicial source' doctrine is one application of this pejorativeness requirement . . . .

"The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task."

*Liteky v United States,* 510 US 540; 114 S Ct 1147; 127 L Ed 2d 474, 488 (1994). Michigan jurisprudence expressly accords with these principles. *Cain v Dep't of Corrections,* 451 Mich 470, 494-497; 548 NW2d 210 (1996).

While a panel of this Court, in *People v Kurz, supra,* suggested that whenever a judge proposes, after the fact, to hold a litigant or attorney in contempt, the judge should automatically disqualify him- or herself, that was *dictum.* Furthermore, the Supreme Court has opted not to include such a requirement in MCR 2.003. *Kurz* has never been cited or applied for this proposition, and even if this were a holding rather than *obiter dictum,* it would not be binding on the present panel. Admin Order 1996-4; *In re Bay Prosecu-*

*tor*, 102 Mich App 543, 549; 302 NW2d 225 (1980). It is noteworthy that the *Kurz* panel neither cited nor considered *Ungar v Sarafite*, *supra*, and obviously the Court in 1971 could not have taken into account *Liteky*, *supra*, or *Cain*, *supra*.

Respondent's reliance on *Mayberry v Pennsylvania*, *supra*, is likewise misplaced and ill-fated. That case involved a judge who was "personally embroiled" in the controversy underlying the contempt proceedings, in stark contrast to the present case.

Counsel relies on an assertion in the opinion reflecting that this Court was "deeply upset" that an attorney would misrepresent the facts to the Court as evidencing predisposing bias. Presumably, all jurists sworn to uphold the Constitution and laws, Const 1963, art 11, § 1, would be "ill disposed" toward those who flout the law, be they murderers, thieves, rapists, or officers of the court who make false representations to the tribunal, designed and intended to mislead the adjudicators in fulfilling their judicial functions. The Court has recognized throughout that Ms. Thurston may somehow be able to justify her actions; that is why it provided her the opportunity to show cause in lieu of making the imposition of a fine absolute. Hence, the Court has done no more than make a preliminary assessment and evaluation which, being subject to revision in light of new or additional evidence or explanation, constitutes no more than a finding of probable cause, and fails to rise to the level of disqualifying bias or prejudice. *Withrow v Larkin*, 421 US 35, 54 ff; 95 S Ct 1456; 443 L Ed 2d 712 (1975). [Unpublished order of the Court of Appeals, entered August 8, 1997 (Docket No. 184811).]

To like effect, see also *In re Albert*, 383 Mich 722, 724-725; 179 NW2d 20 (1970), where the Supreme Court said:

> The Court of Appeals is a court of record and if the order requiring affirmative action by the attorney is a valid order in a particular case, the attorney's neglect or refusal to obey it is contempt of that Court. The statute grants the Court of Appeals jurisdiction to make that determination and punish such actions by appropriate procedure.

> \*    \*    \*

Respondent's assertion that a contempt procedure must include a show-cause order based on an affidavit supporting the charged facts is not correct. A court's judicial notice of its own records is a wholly satisfactory "other method" of establishing the failure or the fact of filing in a particular period—the gravamen of the charge here.

Equally untenable is the respondent's assertion that the Court could not institute these proceedings on its own motion without becoming so personally interested as to be disqualified. The inter-

was granted at the request of respondent's counsel.[4]
This Court, in the order adjourning the hearing,
included scheduling provisions.[5] In a separate

---

est a court has in its relationship with the attorneys practicing
before it not only does not disqualify it from assaying their conduct
in such practice, but on the contrary obliges the court to scrutinize
the conduct of attorneys as officers of that court in sharing the
awesome responsibility of effectively administering justice.

A second panel of this Court, invoked pursuant to MCR 2.003(C)(3)(b) at
the insistence of respondent's counsel, also denied the motion for disqual-
ification in an unpublished order, entered August 5, 1997 (Docket No.
184811).

[4] The original date and time scheduled for respondent to show cause
was August 5, 1997, at 3:00 P.M. At that time, respondent's counsel
requested additional time, indicating that a week would be sufficient.
Scheduling difficulties arising from the demands on each panel member's
time resulted in the next convenient and mutually available date being
identified as September 8, 1997, at 9:00 A.M. Respondent, however, then
sought a further delay, which resulted in the entry of the following order,
which reflects the practical difficulties that beset an appellate court that
sits in panels of three or more judges, MCR 7.201(D), in attempting to
deal with such a situation:

> The motion for stay of proceedings is DENIED. The Court notes
> that, at the original proceeding on August 5, respondent's counsel
> requested an additional week of preparation time, notwithstanding
> the six weeks already allowed before respondent had been sched-
> uled to show cause. When this Court granted that request and
> rescheduled the matter, counsel pleaded for a different date
> because of a family obligation. In response, this Court recessed the
> matter for four weeks and six days, and in doing so had great diffi-
> culty in finding a date on and a time at which all three panel mem-
> bers were available, a fact of which respondent and her counsel
> were well aware. Ample time has been afforded respondent to pur-
> sue appellate remedies or to object to this Court's scheduling
> order, and this case will now proceed on the date and at the time
> and place previously fixed. [Unpublished order of the Court of
> Appeals, entered August 28, 1997 (Docket No. 184811).]

[5] In pertinent part, the scheduling provisions of the order were:

> Pursuant to MCR 7.216(A)(9), on or before August 22, 1997,
> counsel for both sides shall exchange and file with the court wit-
> ness lists[.] Any dispositive motions and supporting briefs shall be
> filed and served not later than August 25, 1997; any other motions
> and supporting briefs, including those relating to evidentiary mat-

order,[6] following the suggestion in *Young v United States ex rel Vuitton et Fils, S A*, 481 US 787; 107 S Ct 2124; 95 L Ed 2d 740 (1987), and as a means of facilitating a separation between the Court's accusatorial and adjudicative roles, Joel M. Boyden, former President of the State Bar of Michigan, having agreed to serve pro bono publico, was appointed to function as presenter of evidence in the show cause proceedings and to otherwise represent the Court of Appeals in any direct or collateral review proceedings.

Pursuant to the scheduling order,[7] respondent filed a motion to dismiss, which was denied, and a motion

ters, shall be filed and served not later than September 2, 1997. [Unpublished order of the Court of Appeals, entered August 8, 1997 (Docket No. 184811).]

[6] This order stated:

On the Court's own motion pursuant to MCR 7.216(A)(7), and pursuant to the Court's inherent power to operate efficiently and fairly, *Chambers v NASCO, Inc*, 501 US 32; 111 S Ct 2123; 115 L Ed 2d 27 [1991]; *People v Brown*, 238 Mich 298; 212 NW 968 [1927]; *Gray v Clerk of Common Pleas Court*, [366] Mich 588, 594; 115 NW2d 411 (1962); Const 1963, art 6, § 1, Joel M. Boyden (P11073) is hereby APPOINTED to function as presenter of evidence and argument at the hearing on the order to show cause and any related proceedings, including appeals or collateral review proceedings. The Court notes that Mr. Boyden has assented to function in this capacity *pro bono publico*. [Unpublished order of the Court of Appeals, entered August 8, 1997 (Docket No. 184811).]

[7] Several issues relating to the scheduling order deserve brief mention. Respondent moved for an extension of time to file a witness list, asserting in conclusory fashion that more time was needed, in contrast to the representation on August 5 by respondent's counsel that he was prepared to proceed and had his witnesses present and available, except for not having had time to review the tape recordings of the complainant's interviews. At the hearing on September 8, respondent sought to amend her witness list by adding an expert on the subject of advocacy. Respondent's counsel proposed to adduce the witness' testimony on a separate record, which under the circumstances would have been tantamount to presenting the evidence to the trier of fact. Better practice would have been for counsel to summarize the salient points of the proposed testimony. MRE

for waiver of fees, which was also rejected. Only the court-appointed presenter opted to file a hearing brief.[8] Two amici curiae were permitted to file briefs,

---

103(a)(2). In any event, we believe that what constitutes proper advocacy is a question of law and therefore not a proper subject of expert testimony. *People v Anderson*, 166 Mich App 455, 464; 421 NW2d 200 (1988); *People v Drossart*, 99 Mich App 66, 75-77; 297 NW2d 863 (1980).

Respondent also argued that Dr. Frank Ochberg could not be qualified as an expert because he was not listed as such on the presenter's witness list. The presenter had listed "Dr. Frank Ochberg or other qualified psychologist or psychiatrist." We think this ample reasonable notice of Dr. Ochberg's status as an expert witness. No claim was made by respondent that she sought and was denied a summary of the subject matter of the expert's proposed testimony; to the contrary, copies of Dr. Ochberg's report to the presenter, as soon as it became available, and of his curriculum vitae were furnished to respondent's counsel before the hearing. MCR 6.201(A)(3). Thus, as a practical matter, respondent was fully aware of the expert capacity of the proposed witness, even if the listing was somehow deficient—as graphically demonstrated by the fact that respondent's co-counsel was thoroughly prepared to cross-examine Dr. Ochberg as an expert and to raise objections to his testimony. Indeed, co-counsel examined no other witnesses and took no other on-the-record part in the show cause hearing.

[8] The election of respondent's counsel not to file a hearing brief must be contrasted with the numerous ad hoc arguments, demands, and assertions, all without citation of supporting authority, that counsel sought to foist upon this Court at the show cause hearing. For example, counsel demanded that the Court identify what it believed to be the elements of a charge of contempt of court. However, it is our view that the onus of first stating what counsel contend are those elements, with pertinent authorities, lies with the attorneys at the bar, following which the Court responds with a ruling. The sentiments voiced in *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959) ("It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow."), applies with equal vigor to trial-type presentations. MRE 103(a)(1). Many other legal claims were advocated in similar fashion, promoted as "obvious" or otherwise well known, none with precedential support being contemporaneously (in default of having been covered in a hearing brief) proffered. These tactics greatly complicated the Court's task of doing justice to the respondent's cause. Of necessity, we have had to rely on the joint brief of amici curiae as a substitute for any brief on respondent's own behalf.

and their joint brief has been received and considered.

## II. MOTION PRACTICE HISTORY

In denying the motion to dismiss, which was grounded upon the assertion that the order to show cause did not charge that respondent acted "wilfully," this Court observed:

> The motion to dismiss is DENIED. "Willfulness" is not an element of a charge that an attorney is in contempt of court by virtue of "any misbehavior in their office or trust" under MCL 600.1701(3); MSA 27A.1701(3), and accordingly the failure to specify that the alleged contemnor acted wilfully is not fatal to the validity of the charge detailed in the amended order to show cause. *In re Henry*, 25 Mich App 45, 55; 181 NW2d 64 (1970). Furthermore, granting *arguendo* that an order to show cause is subject to the same requirements as an indictment, information, or other charging document, MCL 761.1(d); MSA 28.843(d), and further assuming that other aspects of the charged conduct must be shown to have been perpetrated "willfully" in order to adjudge the alleged contemnor guilty of contempt, nonetheless, "willfulness" need not be alleged in the order to show cause. MCL 767.59; MSA 28.999, although the order to show cause would in any event be subject to amendment to cure any such defect of form. MCL 767.76; MSA 28.1016. To that end reasonable inferences from the facts set forth in the charge and supporting opinion of the court suffice to put the alleged contemnor on notice that her conduct was contemptuous because committed wilfully. *In re Henry, supra; In re Albert*, 383 Mich 722, 724-725; 179 NW2d 20 (1970) (holding both that the Court of Appeals may proceed other than by affidavit to institute contempt proceedings by means of an order to show cause, in particular, by judicial notice of its own records, and that it may do so on its own motion "without becoming so personally interested as to be disqualified.")

> The Court notes that this order addresses only those aspects of the present proceedings that represent an exercise of its criminal contempt powers, and not the separate and independent civil remedial side of its inherent powers. *Chambers v NASCO*, 501 US 32; 111 S Ct 2123; 115 L Ed 2d 27 [1991]; *Gray v Clerk of Common Pleas Court*, [366] Mich 588, 594; 115 NW2d 411 [1962]; *People v Brown*, 238 Mich 298, 300; 212 NW 968 (1927); Const 1963, art 6, § 1. [Unpublished order of the Court of Appeals, entered August 28, 1997 (Docket No. 184811).]

In rejecting the motion to waive fees, the Court opined that it was without proper authority to grant a waiver in the absence of a claim of financial inability to defray those fees. The waiver of fees was not sought on the basis of inability to pay, but on the basis of an assertion that if such proceedings were pending in a district or circuit court there would be no fees. Underlying the motion appeared to be an assumption that somehow it is unfair to require respondent to pay motion and other standard filing fees when criminal defendants in trial courts are not required to pay motion fees. Any such contention misapprehends the relevant principles of due process and equal protection. Under the Fourteenth Amendment, fees must be waived only for those unable to pay them as a function of the constitutional right of access to the courts, *Boddie v Connecticut*, 401 US 371; 91 S Ct 780; 28 L Ed 2d 113 (1971); however, respondent made no claim or showing of such inability. And, while motion fees may not be required in district or circuit court criminal proceedings, that is a function of legislation, not constitutional principle. See, e.g., MCL 600.8371; MSA 27A.8371, establishing filing fees in district courts for civil cases only. In contrast, legislation governing the Court of Appeals,

MCL 600.321; MSA 27A.321, and the rule establishing the fee schedule for the Supreme Court, MCR 7.319(B)(7), make no such distinction, and thus apply equally to civil and criminal matters. All litigants in the Court of Appeals and the Supreme Court are treated alike, whether as appellants or appellees, or as parties to original proceedings, irrespective of the nature of the proceedings.[9] Hence, our order denying the motion to waive fees provided:

> The motion to waive filing fees is DENIED. No claim of indigency within MCR 2.002  having been advanced, the Court is without authority to waive fees. MCR 7.211(A)(3); MCL 600.321;   MSA 27A.321;   *Gracey v Grosse Pointe Farms City Clerk,* 182 Mich App 193, 214; 452 NW2d 471 (1989);  see also *Hill v Michigan,* 488 F2d 609 (CA 6, 1973), cert den 416 US 973; 94 S Ct 1999; 40 L Ed 2d 563 [1974].

### III. FACTS

At the hearing, the presenter went forward with proofs establishing, beyond a reasonable doubt, that the statements attributed to respondent during oral argument in this Court's June 24, 1997, opinion were accurately quoted therein, and that the facts asserted in those statements by respondent were factually untrue.[10] Respondent's proofs did not attempt to rebut the claim that she was the speaker, that the state-

---

[9] Our analysis herein of this issue is buttressed by the Michigan Supreme Court's order, denying Ms. Thurston's application for leave to appeal from our order denying disqualification, and also denying Ms. Thurston's motion for waiver of fees in the Supreme Court. 456 Mich 875 (1997).

[10] In any event, these facts were subject to judicial notice based on the record, which both the presenter and respondent's counsel asked this Court to take of its own records as well as those of the trial court. We agree that such judicial notice is proper. *People v Snow,* 386 Mich 586, 591; 194 NW2d 314 (1972);  MRE 201(b).

ments charged as uttered by her were accurately quoted, or, at least in the abstract, that those statements were false. The defense evidence suggested good-faith misunderstanding based on context and good-faith error based on interpretation and possible confusion, as well as good character generally.

### IV. COUNT I: THE "NO SEX" STATEMENT

Although we have considered undisputed, uncontradicted, and unrebutted testimony adduced by respondent during her case in chief tending to establish her good character,[11] *People v Garbutt*, 17 Mich 9, 25-27; 97 Am Dec 162 (1868); *People v Schultz*, 316 Mich 106, 112-124; 25 NW2d 128 (1946) (and accordingly instructed ourselves, as triers of fact, that "evidence of good character is admissible, not only in a case where doubt otherwise exists, but may be offered for the purpose of creating a doubt"), we nonetheless conclude that the positive evidence of wrongdoing overcomes this proof of previous good character and truthfulness, and that we are thus left without a reasonable doubt that respondent did make a false representation of material fact to the Court.

It seems to be suggested by amici curiae that, in light of the original briefing of the principal appeal,

---

[11] Actually, the evidence was not technically character evidence at all, because it focused only on some elements of good character, such as professional integrity. More accurately, as presented, the evidence focused on respondent's community reputation for truthfulness, MRE 608. However, in lieu of proper character evidence, this Court recognized that respondent's license to practice law is a continuing proclamation by the Michigan Supreme Court of her good character. MCR 9.103(A). It is not insignificant that none of these "character" witnesses, all but one of whom are attorneys in good standing actively practicing law, offered any assertion that, on the basis of a review of the record and of respondent's conduct, they would have considered it proper in respondent's position to make the statements at issue during oral argument.

this Court could hardly have been misled about the salient facts regarding respondent's "no sex" statement. In response, we note first that when a false representation or false statement of material fact is made to a tribunal, the gravity of the offense is not eliminated merely because the lie is readily exposed or the prevarication is recanted or corrected. *United States v Allen*, 131 F Supp 323, 326 (ED Mich, 1955).

Second, this Court was in fact misled, and we emphasize that the Court properly *should have been thus misled.*[12] Whatever members of the Court thought the facts to be before oral argument, when an attorney, as an officer of the Court, MCR 9.103(A), makes an assertion of fact that contradicts such prior conceptions, this Court's adjudicative responsibilities will generally compel it to either take the attorney's word at face value or to independently verify for itself where the truth lies. This Court did so in this case, which involved a substantial expenditure of judicial resources—scarce taxpayer-funded judicial resources that more properly would have been devoted to the disputes of other litigants and their attorneys.

The suggestion that such falsehoods were immaterial in light of the numerous grounds that this Court found as a basis for granting defendant Shier appellate relief is without foundation. Each reason

---

[12] It should be noted that while the inaccuracy of the "no sex" statement was determinable by examination of the record, the claim of laughter concerned a matter not of record, made in the context of a motion to remand, MCR 7.211(C)(1) . As a consequence, at least in part, of this false representation, this Court had to consider the claim as true for purposes of adjudicating the motion to remand itself, and this then caused further unnecessary proceedings in the trial court and subsequent review of the trial court's ruling in this Court once again, a threefold wasteful expenditure of judicial resources.

advanced by respondent had to be considered and evaluated on its merits, if for no other reason than that another, higher reviewing court might reject any one or more proffered bases in the opinion for either granting or withholding appellate relief from the conviction.

Concerning the statement that "he never had sex," it has been vigorously argued that this Court has taken the remarks out of context. It is urged that, properly construed within the jurisprudential framework of allowing counsel great leeway to vigorously advocate on behalf of her client, *People v Kurz*, 35 Mich App 643, 651; 192 NW2d 594 (1971), while correlatively demanding clear and unequivocal proof that such boundaries have been exceeded, *People v Matish*, 384 Mich 568, 572; 184 NW2d 915 (1971), the statement was neither inaccurate nor misleading.[13] The theory advanced is that, extemporizing in response to a question from the bench, respondent was adverting to an incident in the living room when the defendant asked the complainant for oral sex and she refused—thus, there was no sex between the

---

[13] It was additionally contended that respondent would not have done so because, when the misrepresentation was eventually exposed, the attempted fraud would have redounded to the detriment of her client. Of course, if not discovered, the misrepresentation would presumably assist the client's cause, so the claim of lack of motive is not probative. We respond to this argument only to make pellucidly clear that, as occurred in this very case, perceived misconduct by counsel, unless shown to be sanctioned by the client with an understanding of its wrongful character, affects only the Court's future dealings with the attorney, and in no way adversely effects the client's cause before the Court in adjudicating issues of law presented for appellate resolution. This Court does not ordinarily resolve factual questions in the first instance, but where the client directly or through connivance with counsel attempts to perpetrate a fraud on the trier of fact, adverse inferences may properly arise when the impropriety comes to light. *Wright v West*, 505 US 277, 296; 112 S Ct 2482; 120 L Ed 2d 225 (1992) (plurality opinion).

complainant and defendant Shier in the living room, although, on Shier's theory, he subsequently had consensual sex with the complainant in the bedroom.

The problem with this explanation is that respondent's statement was in response to a question about other witnesses, claims of their sexual involvement with the complainant (some of which occurred in the living room and some in the bedroom), and the rape-shield statute.[14] No mention had been made of events in the living room for the purpose of contrasting them with events in the bedroom.[15] If such contrast was the intended context of the statement by respondent, this intention cannot even in hindsight be gleaned from the words uttered, whether considered as a whole or in isolation, and in fact that was not the meaning then conveyed to the panel. Indeed, Shier might have been prosecuted on an aiding and abetting theory with regard to events *in the bedroom*; after he terminated his own single act of sexual penetration of the complainant, he remained present[16] while at least two of

---

[14] MCL 750.520j; MSA 28.788(10).

[15] At the show cause hearing, respondent insisted, through counsel, that this "context" would manifest itself upon examination of the prosecutor's oral argument. By stipulation, respondent's oral argument having been previously transcribed by Judge (now Justice) TAYLOR's secretary, respondent's co-counsel accepted the responsibility of transcribing the prosecutor's portion of that oral argument. We have now received and reviewed a complete transcript of oral argument and find nothing whatsoever in the prosecutor's remarks that references or intimates a bifurcation of events as between the living room and the bedroom.

[16] We do not mean to suggest that "mere presence" would be enough to prosecute on an aiding and abetting theory. *People v Jones*, 106 Mich App 429, 434; 308 NW2d 243 (1981). Rather, the "five against one" circumstances of the entire incident might be viewed by a trier of fact as constituting implicit aid and encouragement by Shier toward other perpetrators, and as notification to the complainant that she was alone, helpless, and could expect no succor from any of the other dramatis personae. Any advice, aid, or encouragement, however slight, if otherwise effectual, suf-

the other protagonists entered the bedroom and engaged in further acts of sexual penetration with the complainant.[17]

We are satisfied that the charge that respondent made a false statement of fact in this regard, as alleged in footnote 2 of our June 24, 1997, opinion, has been proved beyond a reasonable doubt, and that the claim of contextual misunderstanding consists mainly of after-the-fact rationalization. We therefore adjudge respondent guilty of this count of contempt and assess a fine of $250.

### V. COUNT II: THE "LAUGHING, NO CRYING" STATEMENT

Regarding the second allegedly false statement, amici curiae suggest a semantic distinction between "through" and "throughout" and that respondent, in fact, having listened to the tape recordings of the complainant's police interviews, did hear what to her sounded like laughter. Respondent's theory is thus that she was mentally predisposed to hear such laughter because the defendant's father, on first retaining her services, had presented photographs allegedly taken of the complainant, a few days after

---

fices to establish guilt as an aider and abettor. *People v Washburn*, 285 Mich 119, 126; 280 NW 132; 123 ALR 311 (1938),  cert den 305 US 577 (1939).

[17] Nor was there any such dichotomy in the defense theory of the case at trial. After both sides rested, the jury was excused and the trial court discussed jury instructions with both counsel. The prosecutor explicitly stated, in direct contradiction of a suggestion *made by the trial court,* that the people's theory of the case was that there was a single event for the jury to consider. Defense counsel appeared to acquiesce in this resolution, but in any event never suggested, whether in argument to the court or the jury, that the events in the bedroom were somehow separate and apart from those in the living room.

the incident, socializing at a party and laughing.[18] Respondent also produced notes she claims to have handwritten upon the first interview transcript as she listened to the recordings, indicating that she heard what she interpreted as laughter in three places during the first interview—all occurring on only one of the thirteen pages of the transcript.[19] She then proffered the explanation that, because she had listened to the tape recordings more than a year before oral argument, and also recalled the photographs (which were not then part of the record in any sense, and which have yet to be properly authenticated or admitted as accurately portraying what they are now claimed to depict), it all blended in her mind and led to her ostensibly good-faith but mistaken statement concerning laughter through the tape(s).

As part of the Court's task of adjudicating the original appeal on behalf of defendant Shier, the members of this panel listened to those tape recordings, and heard no laughter. We have listened again to the three critical points referenced in respondent's handwritten notes, and hear no laughter.[20] Further, at the show

---

[18] Although never directly stated in so many words, apparently respondent is of the view that if, a relatively few days after so traumatic an incident, the complainant could resume normal social activities and her sense of humor was by then apparently restored, this suggests that the incident was not as the complainant represented. No empirical analysis or evidence to suggest such a constancy of human behavior across the infinite spectrum of emotions and psychological response was presented to validate this notion, although we recognize that a zealous advocate might regard this as evidence to be exploited in support of such an argument to a jury.

[19] These salient facts must be contrasted with the representation at oral argument that laughter could be heard "through" the "statements."

[20] If certain extraneous sounds could be interpreted as laughter (which we do not think reasonably plausible even for a zealous advocate), even so they appear only in an isolated portion of the recording of the first interview, not "through" the interviews, and crying is indeed audible dur-

cause proceedings, testimony was presented from Judge (now Justice) TAYLOR's law clerk, Bruce H. Edwards, Esq.,[21] that, having listened to those tape recordings, he heard no laughing on either tape, but he did note two instances, on the second tape, of apparent crying. The members of this panel, listening to the recordings, also collectively heard such crying.[22]

Frank Ochberg, M.D., a board-certified psychiatrist with specialization in sexual assault trauma counsel-

---

ing the second interview in direct contradiction of respondent's representations to the Court. Notably, respondent during the show cause proceedings made no attempt to adduce evidence of actual laughter being audible on either tape recording, or to contradict the assertion that crying was clearly audible on the recording of the second interview.

[21] It was suggested on respondent's behalf that Mr. Edwards' continuing relationship with Judge TAYLOR is an additional ground for disqualification of Judge TAYLOR. In a case of this nature, however, assistance will normally have been provided to the judges of this Court by its staff, most of whom are both personally familiar to most or all of the judges and, by the nature of their positions, highly trusted—were the situation otherwise, their employment would naturally be terminated. When pro forma testimony is necessary to establish some apparently disputed point, if recusal of employing judges were required this Court would be unable to fulfill its judicial functions. *United States v Will*, 449 US 200, 213-216; 101 S Ct 471; 66 L Ed 2d 392 (1980). Analogously, trial judges may see the same police officers or other official functionaries, as well, unfortunately, as the same criminal defendants, on numerous occasions, but they are not thereby disqualified from assessing their credibility anew as the situation requires, merely because of such prior familiarity. *People v White*, 411 Mich 366, 386; 308 NW2d 128 (1981). The other panel members therefore supported Judge TAYLOR's action in continuing to participate as an adjudicator in this case. Further, the factual issues to which Mr. Edwards testified were not actually controverted; no argument has been made that anything like laughter can be heard by any reasonable person on either tape recording, or that reasonable persons would not agree that crying is heard on the recording of the complainant's second police interview. And Mr. Edwards' testimony was wholly corroborated in all significant particulars by Dr. Ochberg.

[22] Again, these observations must be juxtaposed with respondent's "no crying" representation at oral argument. See footnote 19, *supra*. Overall, therefore, respondent's characterization at oral argument of the complainant's affect as evidenced by the recordings was outrageously false.

.

ing and the behavioral dynamics of complainants of violence, was qualified as both a lay and an expert witness. His testimony was that, having listened to the two recordings, he neither as a lay witness possessing a finely attuned ear honed through decades in the field during which he involved himself in such issues and necessarily acquired unusual powers of discernment for auditory indicia of mood nor as an expert heard any laughter, nor did he detect anything indicative of an affect suggesting confabulation, prevarication, or other type of dissembling. He did hear crying directly in one instance during the second interview and also a pause that contextually was likely crying.

This Court would readily concede that if a reasonable[23] argument by a vigorous advocate could be made that laughter, or some other apparently inappropriate, qualitatively equivalent sound of similar ilk, is audible "through" the taped statements, then the principles of vigorous advocacy would militate most strongly in favor of absolving respondent of blameworthy conduct in that respect. MRPC 3.1. Nonetheless, the proofs satisfy this Court that no nonfrivolous claim of audible laughter through the tape recordings can be made,[24] while crying is plainly present, and thus that

---

[23] Factual representations are generally subject to the requirement that they be the product of a "reasonable inquiry." MCR 2.114(D)(2). This concept dovetails with one of the principles governing attorneys in fulfilling their representational responsibilities, which is that counsels' actions are to be based on a modicum of objectivity, a threshold requirement that would not necessarily be expected of a party proceeding inops consilii. *Watkins v Manchester*, 220 Mich App 337, 343-344; 559 NW2d 81 (1996), citing *Kay v Ehrler*, 499 US 432, 437-438; 111 S Ct 1435; 113 L Ed 2d 486 (1991).

[24] It was argued by respondent's counsel that "laughter," the terminology used during oral argument, should be broadly construed for purposes

respondent is in this second respect also guilty of misconduct amounting to contempt of court.[25]

This Court additionally rejects the contention that if respondent thought that what she was saying was at least arguably accurate, it cannot be contemptuous even if it lacked a non-frivolous basis in fact. To accept such an argument would utterly emasculate the contempt power, leaving this Court hostage to the imaginings and hallucinations, rationalized post hoc,

---

of the show cause proceedings to refer to the complainant's demeanor generally. While we are skeptical whether such an elastic use of language to rationalize what would otherwise be serious misconduct might ever be proper, *People v Mallory*, 378 Mich 538, 573-574, n 5; 147 NW2d 66 (1967) (SOURIS, J., concurring), here, there were no verbal clues to put the Court as listener on notice that such unparalleled inexactitude was within the parameters of comprehension intended by the speaker. When a party to a colloquy desires to speak in code, whereby "black" means "white," a prerequisite is that there be some basis for surmising that the other party shares that nonstandard interpretation. 3 *Corbin, Contracts*, § 544, cited in *Beason v Beason (After Remand)*, 204 Mich App 178, 185-186; 514 NW2d 231 (1994) (TAYLOR, J., dissenting), rev'd 447 Mich 1023 (1994).

[25] Significantly, a similar assertion was made by respondent in her affidavit in support of the motion to remand, filed before oral argument in the principal appeal. See footnote 12, *supra*. In pertinent part, the affidavit asserted, under oath:

Jane M. Thurston, being first duly sworn, deposes and says as follows:

1. I have reviewed the public defender's file, the police reports, and listened to the four taped statements of Bobby Shier and [the complainant].

\*     \*     \*

3. [The complainant] was interviewed on November 23, 1993, and January 5, 1994. There is no audible crying on either taped statement, but laughter is heard. She said . . . .

We have considered the affidavit only as evidencing that the statement at oral argument was not the product of inadvertence or confusion, but have not considered the affidavit as a possible further instance of contempt or, being made under oath, as perjury, and that issue remains open for double jeopardy purposes. *United States v Dixon*, 509 US 688; 113 S Ct 2849; 125 L Ed 2d 556 (1993).

of those who argue before it. *In re Henry*, 25 Mich
App 45, 55; 181 NW2d 64 (1970). [26]

### VI. SELECTIVE PROSECUTION

Respondent and amici curiae contend that this
Court has singled out a criminal defense attorney for
referral to the Attorney Grievance Administrator,
while allegedly ignoring supposedly equally egregious
misconduct by prosecutors, both as a general
proposition and in this case specifically. This conten-
tion totally lacks merit. Aside from qualitative differ-
ences, on which basis alone distinctions concerning
invocation of the contempt power are perfectly
appropriate, *Saginaw v Hargrove*, 169 Mich App 594,
598; 426 NW2d 720 (1988), improper prosecutorial
closing argument *at trial* of the type found by the
panel and reflected in the opinion released June 24 is
neither a contempt *of the Court of Appeals* nor a vio-
lation per se of the Michigan Rules of Professional
Conduct. Compare MRPC 3.4(e) and 3.8. This Court
did fault the prosecutor for making an argument, the
effect of which was to shift the burden of proof from
the state to the defendant. While such argument is
improper as a matter of substantive due process and
thus provides grounds for appellate relief, this partic-

---

[26] We recognize that a portion of this part of the *In re Henry* opinion,
where it is asserted that a " '[criminal] defendant is presumed to intend
the natural and probable consequences of his act,' " *In re Henry, supra* at
55, quoting 48 Mich L R 860, 865, 866 (1950), is constitutionally inaccu-
rate. *Sandstrom v Montana*, 442 US 510; 99 S Ct 2450; 61 L Ed 2d 39
(1979); *People v Gaydosh*, 203 Mich App 235, 238; 512 NW2d 65 (1994).
However, interpolating instead the notion that such an inference of intent
is permissible—exactly what the Court, in context, said in *In re Henry,
supra* at 55, quoting 48 Mich L R 860, 865, 866 (1950) (" '[I]t is generally
held that intent may be inferred from the act—defendant is presumed to
intend the natural and probable consequences of his act.' "), the *Henry*
decision remains valid in the respects relied upon in this opinion.

ular prosecutorial error did not strike the panel as demonstrably violative of any Rule of Professional Conduct and thus did not engender a request for investigation addressed to the Attorney Grievance Administrator.[27]

The claim that the prosecution "obstructed" the efforts of the defense to introduce admissible and compelling DNA evidence must be rejected on several grounds. First, the opinion of June 24, 1997, expressly notes that this Court makes no determination whether the prosecutor was in any way at fault with regard to this matter. Second, even if on this record the prosecutor committed an *Agurs*[28] violation, again, that is a matter of due process appropriate for appellate relief, rather than an instance of attorney misconduct that is grounds for discipline, especially absent evidence of a culpability in failing to furnish this to the defense, of which there is none whatsoever of which this Court is aware. Hence, MRPC 3.4(a) does not apply, even assuming arguendo, for purposes of resolving the criminal appeal, that the prosecutor "obstructed" defendant's access to this evidence of questionable materiality and relevance.[29]

---

[27] It should also be noted that there is a significant difference in the manner in which trials and appeals are conducted. In a trial court, it is the norm for any misstatement or distortion of fact or law to be immediately contested, by objection or other interruption. In an appellate court, such interjections are not encouraged, and counsel must accordingly not assume that an opposing attorney will efface any significant misrepresentation that is uttered. Nonetheless, although the offending remarks came during Ms. Thurston's rebuttal, that is not license to misrepresent, and the prosecutor should have promptly but politely requested a brief surrebuttal or filed a postargument motion addressing these false statements.

[28] *United States v Agurs*, 427 US 97; 96 S Ct 2392; 49 L Ed 2d 342 (1976).

[29] In his opening statement to the jury, the trial prosecutor said, "According to him [Shier, Jr.], which is uncontroverted, he puts on a con-

In the same vein, at the hearing respondent's counsel cited four cases in this Court in which a prosecutor is alleged to have filed a brief containing such gross misstatements of fact or law so as to have resulted either in the striking of the brief, negative comment in the opinion (unpublished) of this Court, or similar adverse action short of either a prosecution for contempt or the referral to the Attorney Grievance Administrator for investigation, both of which this case engendered. If the purpose of this argument was to suggest that, because in the past this Court has opted to overlook the contemptuous and disciplinary-referral aspects of such attorney misconduct, it is bound to continue that policy, then the effort is misdirected and wrong. Past lack of enforcement of the law in no way precludes or estops the application of the law to new transgressions. *Stopera v DiMarco*, 218 Mich App 565, 569; 554 NW2d 379 (1996). If this Court has been somewhat lax in its previous enforcement of the contempt statute, MCL 600.1701; MSA 27A.1701, or in its use of its nonstatutory contempt or other inherent powers, whether against attorneys or any other class of persons, that "fact" does not mean that these powers have been repealed de facto. *Washtenaw Co Rd Comm'rs v Public Service Comm*, 349 Mich 663, 682; 85 NW2d 134 (1957).

Similarly, if these anecdotal references are meant to indicate an invalidating selective enforcement, again, the point is without merit. First, particular facts distinguish each individual exemplar from the

---

dom, and he has sexual intercourse with her." Hence, it would not be expected that Shier, Jr.'s semen would have been found on or in the complainant, and its absence adds nothing quantifiable to the claim that the sexual act was consensual.

case at bar, and this Court, like any other governmental authority exercising prosecutorial charging discretion, may properly proceed only against some violators. Respondent is not entitled to exoneration because others may not have had the full weight of the law visited upon them for their similar transgressions. *People v Jaffray*, 445 Mich 287, 294, n 15; 519 NW2d 108 (1994); *People v Jamieson*, 436 Mich 61, 84, n 13; 461 NW2d 884 (1990) (plurality opinion).

Additionally, those other incidents arose before different panels of this Court; not one judge of the present panel was a member of those other panels. Different judges may well exercise their necessarily wide discretion regarding such matters differently. However, because selective prosecution claims require proof of purposeful or intentional discrimination, any such claim with regard to this case is without merit. *People v Weathersby*, 204 Mich App 98, 114-115; 514 NW2d 493 (1994).

Further, there is no constitutionally suspect invidious criterion, such as race, religion, or gender, underlying these case-by-case evaluations, one or more of which is prerequisite to a finding of unconstitutional selective enforcement. *Recreational Vehicle United Citizens Ass'n v Sterling Heights*, 165 Mich App 130, 141; 418 NW2d 702 (1987); *People v Monroe*, 127 Mich App 817, 819; 339 NW2d 260 (1983); *Oakland Co Prosecutor v 46th Dist Judge*, 76 Mich App 318, 331; 256 NW2d 776 (1977); *United States v Armstrong*, 517 US 456; 116 S Ct 1480; 134 L Ed 2d 687 (1996); *Whren v United States*, 517 US 806; 116 S Ct 1769; 135 L Ed 2d 89 (1996).

Finally, this panel states for the record that it would have been just as assiduous in addressing mis-

conduct by the prosecutor if it believed such wrong-doing had occurred. This panel, like this Court in general, both recognizes and encourages zealous advocacy, whether by the criminal defense bar or any other, but will not tolerate misconduct of any kind, without regard to the identity of the wrongdoers. If this panel entertained a reasonable doubt regarding whether the proper boundaries of zealous advocacy had been exceeded, these show cause proceedings would either never have been instituted or would now be dismissed in their entirety.[30]

---

[30] Respondent has argued that in order to generate a sufficient evidentiary basis for a finding of contempt, wilfulness or other equivalent culpable mental state must be shown. However, under MCL 600.1701(c); MSA 27A.1701(c), "wilfulness" is not necessarily an element of a charge of contempt of court, and therefore it is not such an element here, where an attorney is charged with "any misbehavior in [her] office or trust" as contrasted with "willful neglect or violation of duty . . . ." *In re Henry, supra* at 55. Furthermore, assuming arguendo that wilfulness must be shown, this is not a rigorous burden; it need only be proved that " 'a thing [was] done without ground for believing it is lawful or conduct marked by careless disregard whether or not one has the right so to act.' " *Detroit v Pillon*, 18 Mich App 373, 377; 171 NW2d 484 (1969), quoting *United States v Murdock*, 290 US 389, 394; 54 S Ct 223; 78 L Ed 381 (1933). *Pillon* is particularly on point because the issue was raised on behalf of an attorney, who asserted that his actions, though other than accidental and undertaken with knowledge that their propriety would be contested, was for the purpose of challenging the legality of a tax and thus lacked prerequisite "evil intent" or "bad purpose." This court rejected that contention and upheld a criminal conviction for tax evasion. When a person knows that a situation exists requiring the use of ordinary care, and has the capacity, means, and ability to exercise such ordinary care, but fails to do so, that person's actions are "wilful." *People v Giddings*, 169 Mich App 631, 635; 426 NW2d 732 (1988); *People v Sealy*, 136 Mich App 168, 172-173; 356 NW2d 614 (1984). At the show cause hearing, respondent admitted she had a duty to exercise at least ordinary care to apprise herself of the facts of the case by familiarizing herself with the lower court record and related materials, see Administrative Order No. 1981-7, Standards 6, 9; MRPC 1.1(b), and indeed claimed to have obtained and studied that record before the filing of the brief on appeal and oral argument. We have concluded that at least the level of "wilfulness" described in *Pillon, Giddings*, and *Sealy* has been proved beyond a reasonable doubt.

### VII. SENTENCE

We find that respondent is guilty of contempt of this Court on both of the two grounds charged. For each offense, we fine respondent $250. Despite an utter lack of any profession of remorse during her appearance and testimony during the show cause proceedings, in light of her past apparently exemplary conduct we have concluded that an incarcerative term is not warranted.[31] This fine is payable within twenty-one days of the issuance of this opinion. MCR 7.215(E)(1).

### VIII. CIVIL REMEDIAL SANCTIONS

We have also considered that a civil remedial sanction, as a function of this Court's inherent power,[32] would be appropriate, to recompense the Court, or the taxpayers who fund judicial operations, for the inordinate expenditure of scarce judicial resources that respondent's misconduct directly engendered—a possibility of which respondent was repeatedly warned, beginning with the citation of relevant authorities in the June 24, 1997, opinion of this Court. However, in light of both the magnitude of those costs and the past practice of this Court, which has been to assess costs only in an amount equivalent to this Court's filing fee for a claim of appeal or applica-

---

[31] Under the statute, in lieu of or in addition to a fine, the contemnor may be sentenced to up to thirty days in jail. MCL 600.1715(1); MSA 27A.1715(1). While in this respect the statute speaks of a fine "or" imprisonment, such statutory language permits the Court to combine such penalties. MCL 769.5; MSA 28.1077.

[32] Accordingly, we do not address the issue whether the language of MCL 600.1721; MSA 27A.1721 can be invoked to also authorize such civil sanctions payable to the Court.

tion for leave to appeal,[33] rather than to attempt to calculate actual incremental costs to the Court resulting from negligence or wrongdoing, we assess $200 costs against respondent. These costs shall also be paid within twenty-one days of the issuance of this opinion.[34]

We do, however, take the opportunity to notify the bar and the public that, in the future, pursuant to this Court's inherent power, such ancillary civil sanctions may routinely be liquidated on an actual costs basis whenever wrongdoing or violation of the rules causes this Court or its staff needless additional work. While to date the extent of this Court's inherent powers has not been as thoroughly explored as that of other levels of Michigan's "one court of justice," Const 1963, art 6, § 1; *In re Albert, supra* at 723, n 1, the very principle of "one court of justice" supports our conclusion that this Court enjoys inherent powers suitable to its responsibilities and position within the state's judicial hierarchy. Accordingly, the reasoning and result of *Chambers v NASCO, Inc*, 501 US 32; 111 S Ct 2123; 115 L Ed 2d 27 (1991), and *In re Huff*, 352 Mich 402, 415-416; 91 NW2d 613 (1958), apply to establish the existence of inherent powers that include not merely the contempt power but the power and authority to impose remedial civil sanctions when the justice of a cause and the improper conduct of a litigant or attorney before the court demands it. Such inherent power includes the power to function and to function efficiently, *People v*

---

[33] Currently, this amount is $200. MCL 600.321(1)(a); MSA 27A.321(1)(a).

[34] The total of fines and costs assessed against respondent is therefore $700.

*Brown,* 238 Mich 298, 300; 212 NW 968 (1927), and the power to take appropriate remedial action when any officer of the court, including an attorney, MCR 9.103(A), fails to fulfill a duty or responsibility, *Gray v Clerk of Common Pleas Court,* 366 Mich 588, 594; 115 NW2d 411 (1962). Furthermore, to the extent any such inherent power might be deemed lacking or deficient, MCL 600.310; MSA 27A.310 grants this Court authority and jurisdiction to "issue any writs, directives and mandates that it judges necessary and expedient to effectuate its determination of cases brought before it."[35]

### IX. MISCELLANEOUS

A copy of this opinion shall be forwarded by the Clerk to the Attorney Grievance Administrator.

---

[35] This statute is similar in language and function to the federal All Writs Act, 28 USC 651(a), which also parallels the inherent powers of the federal judiciary. *Texaco, Inc v Chandler,* 354 F2d 655, 657 (CA 10, 1965), cert den 383 US 936 (1966).